**STATE of Tennessee, Appellee,**

**v.**

**Randy Lee JONES, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Aug. 19, 1999.

Application for Permission to Appeal Denied by Supreme Court Feb. 14, 2000.

Paul D. Cross, Monteagle, for Appellant.

John Knox Walkup, Attorney General and Reporter, Karen M. Yacuzzo, Assistant Attorney General, Nashville, J. Michael Taylor, District Attorney General, Dayton, TN, Thomas D. Hembree, Assistant District Attorney General, Jasper, for Appellee.

## OPINION

GARY R. WADE, Presiding Judge.

The defendant, Randy Lee Jones, was convicted of the first degree premeditated murder of Buster Dewey Caldwell and Marsha Sue Green Anderson. Initially, the trial court imposed concurrent life sentences but two months later ordered consecutive sentences.

In this appeal of right, the defendant presents the following issues for review:

(I) whether the evidence is sufficient to sustain the convictions;

(II) whether the trial court erred by permitting the state to impeach witness Mary Perry;

(III) whether the trial court erred by refusing to grant a mistrial or provide a more strongly worded curative instruction following improper impeachment of witness Danny Jones;

(IV) whether the trial court erred by admitting evidence of two prior bad acts by the defendant and evidence of his parole status;

(V) whether the cumulative effect of trial errors resulted in a denial of due process; and

(VI) whether the imposition of consecutive sentences is excessive or constitutes double jeopardy.

We affirm the judgment of conviction of the trial court. Because the trial court erred by imposing consecutive sentences without conducting a sentencing hearing, we remand this matter to the trial court for resentencing.

During the early afternoon of November 14, 1995, Mike Kirk, a criminal investigator for the Grundy County Sheriff's Department, was dispatched to the Marsha Anderson residence in Altamont. When he arrived at the scene, Officer Kirk saw two bodies through an open front door. Sheriff Robert Meeks later identified the victims as Buster Caldwell and Marsha Anderson.

TBI Special Agent Raymond DePriest who conducted an analysis of the crime scene determined that the murders occurred while the victims were eating dinner and watching television. The Anderson residence had been ransacked. No DNA evidence was obtained from the scene and no blood evidence linked the defendant to the murders.

Don Carmen, a ballistics expert for the TBI, found a box of .32 caliber H & R magnum cartridges at the residence which were consistent with the bullets removed from Ms. Anderson. Agent Carmen testified that this ammunition is typically used in a .32 H & R magnum revolver manufactured by New England Firearms. While authorities never recovered the revolver used to shoot Ms. Anderson, Agent Carmen found a 20–gauge Winchester shotgun-shell wad on the floor and another live Winchester shotgun-shell in Caldwell's front pants pocket. Although he could not link the gun to the murder scene through forensic evidence, Agent Carmen identified a 20–gauge single shot shotgun as the likely murder weapon and determined that

Caldwell had been shot from a distance of four to twelve feet.

Dr. Charles Harlan, medical examiner for Robertson County, testified that Caldwell died as the result of a shotgun wound to the chest which penetrated his lung. He stated that Caldwell would have been able to move and speak for three to six minutes. Dr. Harlan testified that Ms. Anderson, who had been shot three or four times in the head, died as a result of a fatal gunshot to the back of her head. Alcohol and Valium was detected in the blood of both victims.

TBI investigator Larry Davis testified that on November 15, 1995, Wayne Fults turned in a 20–gauge shotgun thought to be the Caldwell murder weapon. He also found a handwritten note in Ms. Anderson's kitchen which provided as follows: "B knows who got TV and T. Best buddy R.J. and M.N. Your Pal." Agent Davis had questioned the defendant shortly after the murders. The defendant stated that he and Caldwell had been friends and that on Sunday, November 12, 1995, Caldwell's truck had been stolen and his house robbed. The defendant claimed that, while he was at Slatton's pool hall in Griffith's Creek, he learned where the truck could be found and on the day after the robbery, he had asked Freddie Meeks, a wrecker operator, to tow the truck back to Caldwell's. The defendant claimed that Caldwell had accused Bob Rollins of the theft. The defendant explained the handwritten note as follows:

> [T]he note ... said it was Michelle Norris [the defendant's former girlfriend] and either Baby John or me one, that it had the initials, it didn't say exactly who. [Caldwell] came over to Freddie Meeks' and I was [there] and he showed me the note and he said read this Randy and I read it and said Buster you know where I am at, I am down Neecie's I been down there weeks, he said Randy I know you have, he said whoever done this is trying to set you up....

After the truck was towed to Caldwell's residence, the defendant went to the residence he shared with his girlfriend Denise "Neecie" Laymon, where he ate and went to sleep. The defendant said that on the next morning, November 14, he phoned Caldwell but received a busy signal. He claimed that during the afternoon, he and Fults traveled to Whitwell to purchase some tires from Danny Jones and that when he returned around 4:00 P.M., he learned that Caldwell and Ms. Anderson had been killed. The defendant denied any part in the murders and denied owning any weapons. When asked if his fingerprints would be found on the shotgun, the defendant had replied in the negative.

Freddie Meeks, a wrecker operator, testified the defendant employed him to tow Caldwell's truck. The defendant was accompanied by Caldwell and Ms. Anderson. Meeks stated that Caldwell's truck was not visible from the road but that the defendant was able to direct him to its location. Meeks recalled that Caldwell had confronted the defendant with the note and had asked him how he knew where to find the truck.

Wayne Fults, a first cousin to the defendant, acknowledged a prior conviction for burglary and other charges currently pending against him in Grundy County. He testified that three days before the murders he overheard the defendant threaten to kill Caldwell because he had been "telling his mother stuff and she was telling the cops." Fults stated that Tim Jones, the defendant's brother, also heard the defendant make the threat. On the morning of November 14th, before the bodies were discovered, Fults found a shotgun in a car at Whispering Pines, a plot of land owned by the defendant's family. Fults took possession of the weapon and later that morning, when he and his wife, Deborah, met the defendant and Ms. Laymon, the defendant had asked him if he had found a gun. The defendant told him that the gun needed to be "melted down" because "he'd shot somebody with

it" and Ms. Laymon confirmed, "Yeah, he did, he really did." That afternoon, the defendant told Fults that he shot Caldwell and that DeWayne Asberry shot Ms. Anderson. The defendant revealed that Ms. Laymon was present during the murders. Fults recalled that the defendant also made incriminating statements while visiting Dave and Charlotte Fults. The defendant had stated that "he needed to find that gun. It needed to be got rid of." Fults testified that he turned over the shotgun to Agent Davis on the day after the murders and that for several days after the murders, the defendant had called ten to fifteen times per day to ask if there had been any information announced on the police scanner. Fults denied having cleaned the gun before giving it to Agent Davis and denied having tried to sell the weapon to Donnie Nolan.

Deborah Fults testified that the day the bodies were found, her husband went to Whispering Pines and returned in possession of a shotgun. Ms. Fults recalled meeting the defendant and Ms. Laymon along the road and that the defendant asked whether Fults had found a gun at Whispering Pines and also remarked that "whoever had got it needed to know that he had shot somebody with it." Ms. Fults corroborated her husband's testimony regarding the phone calls from the defendant over the next several days. On cross-examination, Ms. Fults estimated when her husband went to Whispering Pines, he was away for thirty minutes. She stated that Whispering Pines was ten miles from her house.

Mary Perry testified that she was at David and Charlotte Fults' residence on the date of the murders when the defendant arrived. She recalled that the defendant warned Wayne Fults that "if he had ... got a gun out of there that he needed to get rid of it" because "it could be caught up in something." Apparently, the state expected Ms. Perry to repeat a prior statement she made to Agent Davis that the defendant had said, "it could be caught up in a murder" and that the gun had been used as "a murder weapon." When the state was permitted to confront Ms. Perry with the content of the prior inconsistent statement, she maintained that her in-court testimony was accurate and that the defendant had simply said "they had shot a gun the night before." She testified that the defendant had appeared nervous but contended that he had never admitted to committing a murder. She also observed that Wayne Fults' reputation for truthfulness "ain't too good."

Charlotte Fults overheard the defendant using the telephone the day Wayne Fults found the shotgun. She testified that she heard the defendant say, "You better get rid of the gun, or if, if you get caught with it, you're liable to be caught up in a shooting or a murder or something to that." She recalled that the defendant had indicated that the gun was missing from Whispering Pines. She described the defendant as acting "strange." On cross-examination, Charlotte Fults acknowledged that she never heard the defendant confess that he had committed a murder.

Danny Jones, Jr., first cousin to the defendant, testified that he was working in Whitwell on the afternoon of the murders when the defendant approached him and said, "There's some people killed out on the pipeline at Altamont," or "they had found some people dead." While he recalled asking the defendant what had happened, Jones "wasn't really for sure" how the defendant responded. The state had expected him to confirm a prior statement to TBI investigators that the defendant admitted "he had killed the people." While Danny Jones acknowledged that he might have told investigators that the defendant had confessed to killing the victims, he contended that his prior statement was not accurate. Thereafter, the trial court refused to permit the state to question him further about the prior statement and instructed the jury that it could not consider any testimony regarding the prior statement. Danny Jones went on to

testify that Wayne Fults had been angry with Caldwell because Caldwell had "ragged out" his Mustang and then reneged on their agreement to trade vehicles. Danny Jones also testified that after the theft of Caldwell's truck, he had driven the defendant to Slatton's pool hall.

James Caldwell, the victim's uncle, identified the shotgun obtained by Agent Davis as being "just like" the one he shared with Buster Caldwell. He testified that on the night before the murders, Buster Caldwell had borrowed his 20–gauge single-shot shotgun and two Winchester shells.

Bradford Meeks testified that sometime in October of 1995, Ms. Anderson had purchased a model R 73 New England Firearms .32 caliber magnum revolver and a fifty-count box of .32 caliber shells at his hunting supply store.

Jason Slatton, who acknowledged a prior conviction for attempted theft for which he is currently serving a three-year sentence in the community corrections program, testified that he worked at a pool hall in Griffith's Creek and knew both the defendant and Caldwell. Slatton recalled that on the day before the bodies were discovered, the defendant had stopped by the pool hall shortly after dark and had discussed the location of a pickup truck that Slatton had seen abandoned nearby. He recalled that the defendant was accompanied by two women and did not remember seeing Danny Jones at the pool hall that night.

Bob Rollins, who acknowledged a prior felony conviction for receiving stolen property, testified that he had loaned Caldwell one hundred dollars several days before the shootings and Caldwell had not repaid him. Rollins stated that after dark on the evening before the bodies were discovered, Caldwell and Ms. Anderson had stopped by his residence. He believed both had been drinking and were armed with a shotgun and a pistol. Rollins testified that Caldwell informed him that his television and truck had been stolen.

Teresa Blubaugh, Ms. Anderson's daughter, testified that in September of 1995, her mother had separated from her husband, Bob Anderson. Ms. Blubaugh recalled that Bob Anderson had threatened to kill her mother.

Donnie Nolan, who acknowledged prior felony convictions for stealing cars and possession of marijuana, claimed that on the night before he heard about the murders, Wayne Fults came to his house and offered to sell him a 12–gauge shotgun. While Nolan conceded that he never saw the weapon, he observed Fults "duck down" when a car passed, as though he "didn't want nobody to see him." Nolan described Fults as "acting real scared."

Regina Hood testified that she went to Ms. Laymon's residence on the date of the murders and asked her to go shopping. She recalled that Ms. Laymon directed her to drive to Ms. Anderson's house. From the driveway, Ms. Hood saw the front door open and the bodies of the victims on the floor. She left immediately. Ms. Laymon telephoned the sheriff's department from a nearby house.

Denise Laymon testified that she and the defendant were not romantically involved at the time of trial but that, in the fall of 1995, the defendant was living with her and her daughter. She recalled that during the late evening of November 13th, the defendant, Caldwell, and Ms. Anderson, arrived at her mobile home. She stated that the victims had been drinking and remembered that shortly thereafter DeWayne Asberry arrived. Sometime after midnight, the victims left. Ms. Laymon testified that she then retired to her bedroom and the defendant followed a few minutes later. Asberry was permitted to sleep on the couch. Ms. Laymon testified that she was quite sure that neither the defendant nor Asberry left her trailer during the night. She acknowledged that the next morning, she and the defendant went to Whispering Pines where they met Wayne and Deborah Fults along the roadway. Ms. Laymon recalled that

she was driving and listening to the radio and that the defendant got out of the car to talk to Fults. She denied hearing the defendant admit that the he had shot someone and denied saying, "Yeah, he did. Yes, he did." She stated that in the afternoon, she and Ms. Hood decided to go shopping and she intended to ask Ms. Anderson to accompany them. Ms. Laymon suggested they "get out of there" when they arrived at the Anderson residence and saw the victims. She telephoned the sheriff at a nearby house.

Tim Jones, the defendant's brother, testified that he did not recall riding in the car with Wayne Fults or hearing the defendant threaten anyone.

The thirty-year-old defendant testified that he had previously pleaded guilty to several offenses, including burglary of a business, auto theft, and reckless endangerment. He acknowledged that he had been acquainted with Caldwell for six months and Ms. Anderson for a few weeks. The defendant recalled that on November 12, 1995, he had given them some furniture from Whispering Pines because Ms. Anderson's house had been "cleaned out." He claimed that on the next day, he and the victims had returned to Whispering Pines for some lamps and Caldwell had informed him that his truck and television had been stolen. The defendant stated that he met Danny Jones later, told him that someone had stolen Caldwell's truck and television, and asked for a ride to Slatton's pool hall and pawn shop. The defendant claimed that he thought that the television might have been pawned there. The defendant stated that he spoke with Jason Slatton, who directed him to a truck that had been abandoned a short distance away. The defendant testified that he found the truck as he returned to Ms. Laymon's trailer, informed the victims, and arranged for Freddie Meeks to "pull" the truck. While he conceded that the victims followed the wrecker to the stolen truck, the defendant denied that Caldwell had accused him of the theft or that they

had argued about how he had learned where the truck was located. The defendant claimed that Caldwell was laughing when he approached him with a pistol and a note implicating the defendant in the theft. The defendant testified that after towing the truck, he and the victims bought some beer and went to Ms. Laymon's trailer. He stated that Asberry arrived unexpectedly and, shortly past midnight, the victims left. The defendant claimed that was the last time he saw the victims alive.

The defendant testified that he ate a can of soup before going to sleep and denied leaving Ms. Laymon's trailer that night. Although he was not positive, he stated that he did not believe that Ms. Laymon or Asberry left either. He claimed that he attempted to call the victims several times the next morning and received a busy signal.

The defendant recalled that he and Ms. Laymon drove to Whispering Pines and met Wayne and Deborah Fults along the roadway. The defendant stated that Fults asked him if he had been down to Whispering Pines earlier in the day and that he had replied in the negative. He contended that Fults admitted that he had robbed a house and had hidden some guns at Whispering Pines and that Fults asked if he had taken the guns, to which the defendant said no. He claimed that shortly after noon, Wayne Fults called and asked him whether David or Leonard Fults had been to Whispering Pines and taken the guns. Later, when he was at David Fults' house, the defendant called Wayne Fults and informed him that neither David nor Leonard had not been to Whispering Pines and knew nothing about the guns. The defendant claimed that Wayne Fults then directed him to warn them, "if anybody gets caught with [those guns], they'll get caught with a charge." He explained that as he was leaving David Fults' residence, he did remark, "Oh, yeah, if anybody gets caught with them guns they'll catch a charge."

The defendant contended that later that afternoon, while he and Wayne Fults drove to Whitwell to talk to Danny Jones, they overheard a police scanner report that a doctor had been called to the Company Farm. The defendant maintained that Wayne Fults then remarked, "Well, they found somebody dead." The defendant described Fults as being "in a panic." They took an alternate route home.

On cross-examination, the defendant maintained that Wayne Fults was a "rogue and a thief" but acknowledged that he and Fults had been convicted of a joint burglary in the past. The defendant contended that the testimony of Freddie Meeks, Jason Slatton, Danny Jones, and Charlotte Fults was mistaken and that Wayne and Deborah Fults had lied. He claimed that he did not leave Ms. Laymon's trailer on the night the victims were murdered and denied either going to Ms. Anderson's house or shooting Caldwell with a 20–gauge shotgun. He also denied putting the shotgun in the blue Lincoln Continental at Whispering Pines and denied telling Fults that he was angry with Caldwell for statements Caldwell made to his mother regarding activities of the defendant. The defendant acknowledged that he was on parole at the time of the offenses.

Wayne Fults, who was recalled by the defense, testified that while he and the defendant were in Whitwell to see Danny Jones, he "thought" that he heard over the police scanner that Lana Morrison, a former girlfriend of the defendant, had reported to the sheriff's department that someone had "taken a shot at her." When Fults told the defendant the news, they "hightailed it" out of Whitwell, and took an alternate route home. Fults denied concocting that story to conceal his nervousness about the discovery of the victims at Company Farm. He denied having stolen the guns and hiding them at Whispering Pines.

Lana Morrison testified as a defense witness that the defendant returned to live with her on the day after the murders.

She stated that she had a police scanner in her trailer at the time and implied that there would have been no need for the defendant to call Wayne Fults to get information about the murder investigation. On cross-examination she recalled that, during the evening of November 12th, someone shot into her trailer and she had notified the sheriff but no one had investigated. There were no records in the sheriff's department of a dispatch for a shooting incident at the Morrison residence on the day Wayne Fults claimed to have heard the report.

Sheriff Meeks, called by the state in response to Ms. Morrison's claims, disputed the veracity of her testimony. He testified that he had investigated the shooting incident at Ms. Morrison's trailer, talked with Ms. Morrison and her mother, and inspected the bullet holes.

The parties stipulated that on November 10, 1995, the victim Anderson sold a piece of real estate and received $241.28 in cash and a $3,000.00 check. On September 20, 1995, she sold some farm equipment and was paid $3,200.00 in cash. On September 19, 1995, she sold some livestock for $3,000.00, paid by check. On September 15, 1995, she sold livestock for $600.00 cash.

I

 The defendant claims that the evidence is insufficient to support the verdicts. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn. Crim.App.1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the

state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R.App. P. 13(e).

▮ First degree murder is defined as a "premeditated and intentional killing of another." Tenn.Code Ann. § 39–13–202(a)(1). " 'Premeditation' is an act done after the exercise of reflection and judgment" and requires that the "intent to kill must have been formed prior to the act itself." Tenn.Code Ann. § 39–13–202(d). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39–11–302(a). While the intent to kill must have been formed prior to the act itself, "it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn.Code Ann. § 39–13–202(d). One respected authority provides some insight into the nature of proof required before a jury might properly infer premeditation:

(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;*

(2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and

(3) facts about the *nature of the killing* from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*State v. Bordis,* 905 S.W.2d 214, 222 (Tenn. Crim.App.1995) (quoting 2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* § 7.7 (1986) (emphasis in original) (footnote omitted)). Premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. *State v. Gentry,* 881 S.W.2d 1, 3 (Tenn.Crim.App.1993). Still, a jury may

not engage in speculation. If any of the elements for first degree murder are absent, a lesser grade of homicide may apply. *Bordis,* 905 S.W.2d at 222.

▮ The state's theory was that the defendant shot Caldwell and an accomplice shot Ms. Anderson. The verdict accredited the witnesses for the state. Taking their accounts in the light most favorable to the position of the state, the evidence, in our view, is adequate to support the verdicts of first degree murder. The defendant told Wayne Fults days before the murders that he intended to kill Caldwell and, afterwards, he admitted to Fults that he shot Caldwell and Asberry shot Ms. Anderson. The defendant had warned, "[the gun] needed to be melted down or something, he'd shot somebody with it." When Fults expressed doubt, Ms. Laymon had exclaimed, "Yeah, he did. He really did." Ms. Fults corroborated much of Wayne Fults' testimony. Furthermore, the defendant made additional incriminating statements in the presence of Charlotte Fults, stating, "[Y]ou better get rid of the gun, or if, if you get caught with it, you're liable to be caught up in a shooting, or a murder, or something to that." A shotgun blast to the chest at close range demonstrates the defendant's intent to cause death and the jury could rationally conclude that was the defendant's conscious objective. This evidence, accredited by the jury, is sufficient to prove intent and premeditation for the killing of Caldwell. *See State v. Terry Lynn Anthony,* No. 02C01–9605–CC–00159, 1997 WL 119516 (Tenn.Crim.App., at Jackson, March 18), *app. denied,* (Tenn., Oct.6, 1997) (statements before and after the killing indicated planning activity).

▮ There is also sufficient evident to support the conviction for Ms. Anderson's death. The defendant may be found criminally responsible for the conduct of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the

offense, [he] solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn.Code Ann. § 39–11–402(2).

> In a prosecution in which a person's criminal responsibility is based upon the conduct of another, the person may be convicted on proof of commission of the offense and that the person was a party to or facilitated its commission, and it is no defense that: ... [t]he person for whose conduct the defendant is criminally responsible has been acquitted, has not been prosecuted or convicted, or is immune from prosecution.

Tenn.Code Ann. § 39–11–407.

> This section reflects a policy determination that, in a case involving multiple offenders, a conviction should be sustained where there is sufficient evidence to support it ... Thus, the defendant may be convicted whether the other parties to the offense are convicted, acquitted, or incapable of criminal responsibility.

Sentencing Commission Comments. Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred. No particular act need be shown. It is not necessary for one to take a physical part in the crime. Encouragement of the principal is sufficient. *State v. McBee,* 644 S.W.2d 425 (Tenn. Crim.App.1982). Mere presence during the commission of the crime is not enough to convict. *See Flippen v. State,* 211 Tenn. 507, 365 S.W.2d 895, 899 (1963); *Anglin v. State,* 553 S.W.2d 616, 619 (Tenn.Crim. App.1977).

Wayne Fults testified that the defendant admitted that he shot Caldwell and Asberry shot Ms. Anderson. There is circumstantial evidence to support Wayne Fults' testimony. The victims were often together and it was not unusual for Caldwell to stay with Ms. Anderson. Hours before the murder, the intoxicated victims announced they were going to Ms.

Anderson's residence and left the defendant and Asberry at Ms. Laymon's. Sometime thereafter, the defendant sought out Caldwell at Ms. Anderson's residence with an intent to kill him. The defendant knew Ms. Anderson would also be present. The murders occurred in close succession and in close proximity. That the defendant planned the murder of Caldwell under these circumstances supports an inference that he also considered the murder of Ms. Anderson. *See State v. Antonio M. Byrd,* No. 02C01–9508–CR–00232, 1997 WL 1235 (Tenn.Crim.App., at Jackson, Jan. 2), *app. denied,* (Tenn., Sept. 22, 1997). Thus, the jury could infer that Ms. Anderson was killed following some period of reflection. Ms. Anderson, who suffered at least three gunshot wounds to her head, was killed by a fatal shot aimed to the back of her head, which demonstrates an intent to kill on the part of the principal. This evidence demonstrates that the murder of Ms. Anderson was an intentional and premeditated killing. Moreover, any rational trier of fact could have found that the defendant was a party to Ms. Anderson's murder. *See* Tenn.Code Ann. § 39–11–407. The jury accredited the testimony of Wayne Fults, to whom the defendant admitted his and Asberry's roles in the murders. This proof was uncontested. Although the state did not offer further evidence of the identity of the Ms. Anderson's killer, that does not alleviate the defendant's criminal responsibility for Ms. Anderson's death. *See State v. Williams,* 920 S.W.2d 247, 255 (Tenn.Crim. App.1995) (although rape victim could not conclusively identify the defendant as the person who penetrated her, the defendant initiated the attack and "clearly assisted" the person who did penetrate her).

■■■ The defendant contends, however, that the convictions are based "almost entirely" on the "almost completely uncorroborated" testimony of Wayne and Deborah Fults and that there was no physical evidence linking the defendant to the crimes. The *corpus delicti* of a crime

requires a showing that a certain result has been produced and the result was created through a criminal agency. *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872 (1911); *State v. Ervin*, 731 S.W.2d 70 (Tenn.Crim. App.1986). Whether the state has sufficiently established the *corpus delicti* is primarily a jury question. *Williams v. State*, 552 S.W.2d 772 (Tenn.Crim.App. 1977). All elements of the *corpus delicti* may be established by circumstantial evidence. *Clancy v. State*, 521 S.W.2d 780 (Tenn.1975). Only slight evidence of the *corpus delicti* is necessary to corroborate a confession and thus sustain a conviction. *Ricketts v. State*, 192 Tenn. 649, 241 S.W.2d 604 (1951). Corroborative findings made in the course of the investigation in addition to the confession may be sufficient to support the conviction. *Ervin*, 731 S.W.2d at 72.

 In our view, the state met its burden of proof as to the *corpus delicti*. "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." *Taylor v. State*, 479 S.W.2d 659, 661–62 (Tenn.Crim.App.1972). Here, the defendant admitted to Wayne and Deborah Fults that he had shot someone the night before and left the gun at Whispering Pines. Wayne Fults found a shotgun at Whispering Pines that morning. Dr. Harlan testified that the victims had died as a result of lethal gunshot wounds from a shotgun and a pistol. The corroborative evidence necessary to support the *corpus delicti* need only support "the essential facts ... to justify a jury inference of their truth." *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 99 L.Ed. 101 (1954). The state has satisfied that standard.

## II

Next, the defendant argues that the trial court erred by permitting the state to impeach state witnesses Mary Perry with a prior inconsistent statement. The defendant contends that Mary Perry was merely a reluctant witness whose testimony was not actually prejudicial to the state and therefore, the trial court erred by permitting the state to impeach her. The defendant relies upon *King v. State*, 187 Tenn. 431, 215 S.W.2d 813 (1948), and *Mays v. State*, 495 S.W.2d 833 (Tenn.Crim.App. 1972). The state argues that under the Tennessee Rules of Evidence and the prior holdings of our state's courts, a party is permitted to impeach its own witness if the witness' testimony contradicts his or her prior statement to the surprise of the party calling the witness.

 Rule 607, Tennessee Rules of Evidence, provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Prior inconsistent statements may be used to impeach the credibility of a witness. Tenn. R. Evid. 613; Neil P. Cohen et al., *Tennessee Law of Evidence*, § 613.1 at 405–06 (3d ed. 1995 & Supp.1998). An inconsistent statement may be used to impeach the credibility of a witness who denies or cannot remember having made a prior statement. *State v. Kendricks*, 947 S.W.2d 875, 882 (Tenn.Crim.App.1996). Rule 607 "permits impeachment by either party so long as the questioning is not a pretext for putting inadmissible hearsay before the jury." *State v. Timmy Fulton*, No. 02C01–9706–CC–00223, slip op. at 5, 1998 WL 188532 (Tenn.Crim.App., at Jackson, April 21), *app. denied*, (Tenn., Dec. 28, 1998).

In *King*, our supreme court adopted the rule that a party can impeach his or her own witness under the following circumstances:

> "[A] party is compelled to call an indispensable witness, or a witness that is hostile taking the party by surprise ... but the impeachment of one's own witness is limited to those cases where his testimony is in direct contradiction to his prior statements, and he cannot be impeached where he is merely reluctant to

give testimony or unless the testimony is actually prejudicial."

215 S.W.2d at 815 (quoting 1 *Wharton's Criminal Evidence* § 484a (10th ed.)). The ruling in *King,* however, which embodied the voucher rule, is no longer controlling and has been replaced by Rule 607, Tenn. R. Evid. Likewise, the rules requiring a direct contradiction have been relaxed. Rule 613, Tenn. R. Evid., requires only an inconsistency in the testimony.

 A party may not call a witness to testify for the primary purpose of introducing a prior inconsistent statement that would otherwise be inadmissible. *Mays,* 495 S.W.2d at 837. Impeachment cannot be a "mere ruse" to present to the jury prejudicial or improper testimony. *State v. Roy L. Payne,* No. 03C01–9202–CR–00045, slip op. at 4 (Tenn.Crim.App., at Knoxville, Feb. 2, 1993). In such circumstances, striking the testimony and providing a curative instruction may be insufficient to render the error harmless, *State v. Steve Johnson,* No. 02C01–9504–CC–00097, slip op. at 15, 1997 WL 80970 (Tenn. Crim.App., at Jackson, Feb. 27, 1997), because the jury is unlikely to consider the prior statement for credibility purposes only and may view it as substantive evidence. *Tennessee Law of Evidence,* § 613.1; *see* Tenn. R. Evid. 403.

 At trial, Ms. Perry testified that the defendant stated he had warned that the gun could be "caught up in something." When the prosecutor asked her if she remembered telling Agent Davis that the defendant said "caught up in a murder," defense counsel requested a jury out hearing and argued that the state should not be permitted to impeach Ms. Perry with her out-of-court statement. The trial court ruled that the state could inquire about the prior statement but that the statement itself was not admissible. The prosecutor then questioned Ms. Perry as follows:

Prosecutor: [D]o you remember telling [Agent] Davis that [the defendant] said the gun was used as a murder weapon?

Ms. Perry: No. He said that they had shot a gun the night before.

On cross-examination by defense counsel, Ms. Perry stated that she had recently informed defense counsel that portions of the statement were inaccurate. She testified that she would "stand by" her in-court testimony. The trial court provided no contemporaneous limiting instruction. In the jury charge, however, the trial judge included in his instructions that proof of a prior inconsistent statement was probative only of credibility and was not to be considered as substantive evidence of the matter asserted in the statement.

Clearly, Ms. Perry's testimony at trial was inconsistent with her pretrial statement. The record demonstrates that defense counsel had not notified the state that Ms. Perry had repudiated the accuracy of portions of her pretrial statement. There is no proof here that the prosecutor called Ms. Perry as a pretext or ruse to introduce her prior statement. Perhaps the better practice would have been for the trial court to provide a contemporaneous instruction, limiting the jury's consideration of the testimony to credibility only; in our view, however, the rule, under these circumstances, permits the state to question Ms. Perry about her prior inconsistent statement.

### III

In a related issue, the defendant argues that the trial court erred by not granting a mistrial or by failing to provide a strongly-worded curative instruction after the state was permitted to impeach Danny Jones with a prior inconsistent statement. At trial, Danny Jones could not recall "for sure" what he had said in his pretrial statement:

I told [the TBI agent] something, I think he reworded it, but, because my words about saying something isn't always accurate with what should have

been said, but *at that time I said that [the defendant] said he had killed the people.*

And if you want me to read [the statement], I'm not very good at reading, and I tried to read it about an hour ago and a lot of those words are pulled together and I don't have my glasses on.

(Emphasis added). Defense counsel objected and asked for a jury out hearing. Danny Jones acknowledged that he had been charged with a felony offense and, just prior to trial, had reached a plea agreement for a suspended sentence of three years. The trial court inquired whether the witness could state under oath that the defendant had admitted killing the victims. Danny Jones replied, "I can't state under oath that he said, I did kill them, but I think that in my mind I did come up with it since he did come and told me about the two murders that he just heard over the scanner...." The trial court recessed to review the case law governing the issue. The next morning, the trial court determined that, under *Mays* and *King,* the state could not impeach Danny Jones with his prior statement because the witness had only a "foggy memory" and had not prejudiced the state by his testimony. The trial court provided a lengthy curative instruction to the jury. When Danny Jones returned to conclude his testimony, the state requested that he be declared a hostile witness but the trial court refused. The state then canceled the plea agreement with him and questioned him about his involvement in the burglary of the Caldwell's truck. Danny Jones asserted his Fifth Amendment right against self-incrimination.

 The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *Arnold v. State,* 563 S.W.2d 792, 794 (Tenn.Crim.App.1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion.

*State v. Millbrooks,* 819 S.W.2d 441, 443 (Tenn.Crim.App.1991). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such by the trial judge." *Id.* The authority to discharge a jury is to be exercised only when there is a cogent reason or manifest necessity. *Jones v. State,* 218 Tenn. 378, 403 S.W.2d 750, 754 (1966). In our view, the testimony of Danny Jones that the defendant had admitted killing the victims was not error and did not require a mistrial.

 The defendant also contends that the trial court erred by refusing to provide a more strongly worded curative instruction. Because we find no error in the impeachment of Danny Jones, no curative instruction was warranted. Under the current rules of evidence, the state, having no notice that Danny Jones had repudiated his prior statement, was entitled to impeach him with it. *See* Tenn. R. Evid. 607 & 613.

## IV

The defendant also contends that the trial court erred by admitting evidence of two prior bad acts and by admitting evidence of his parole status.

Rule 404(b) provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

 Generally, this rule is one of exclusion but there are, as stated, exceptions. *See State v. Parton,* 694 S.W.2d 299 (Tenn.1985); *Bunch v. State,* 605 S.W.2d 227 (Tenn.1980); *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523 (1963); *see also State v. Rickman,* 876 S.W.2d 824 (Tenn. 1994) (favorably citing both *Parton* and *Bunch* ). Most authorities suggest trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." *See Tennessee Law of Evidence,* § 404.7 at 131. That perhaps best explains the traditional posture of the courts that any testimony of prior bad acts by a defendant, when used as substantive evidence of guilt of the crime on trial, is not usually permissible. *Parton,* 694 S.W.2d at 302–03. The exceptions to the rule are when the evidence is offered to prove the motive of the defendant, his identity, his intent, the absence of mistake, opportunity, or as a part of a common scheme or plan. *Bunch,* 605 S.W.2d at 229. Our supreme court recently spoke on the procedure used to determine whether a prior crime or bad act fell within an exception to the rule:

> [I]f evidence that the defendant has committed a crime separate and distinct from the one on trial is relevant to some matter actually in issue in the case on trial, and if its probative value as evidence is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted.

*State v. Howell,* 868 S.W.2d 238, 254 (Tenn.1993) (citing *Bunch,* 605 S.W.2d at 229). In *Howell,* the court applied the balancing test to determine whether prior convictions for other crimes were admissible, as an exception to the general rule, for purposes other than the character of the defendant. *See also State v. Zagorski,* 701

S.W.2d 808 (Tenn.1985); *State v. Taylor,* 669 S.W.2d 694 (Tenn.Crim.App.1983). When the trial court substantially complies with the requirements of Rule 404(b), we review the trial court's determination for an abuse of discretion. *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn.1997).

### Parole Status

 Prior to trial, defense counsel sought to prohibit testimony by Wayne Fults that the defendant told him that he was going to kill Caldwell because Caldwell had told his mother about the defendant's involvement in a car parts ring and Caldwell's mother informed the defendant's parole officer. The state argued that this testimony was "highly relevant" to the defendant's motive and the trial court agreed:

> [The defendant has] told this witness that he intends to kill this person who ultimately is killed and he gives the reason why . . . a bare statement that I'm going to kill 'em because they're talking about me. You know . . . the State ought to be allowed to at least have some logical explanation to why he said that . . . all of that ought to come in . . . in a general fashion.

The trial court ruled that specifics regarding the car parts ring and the nature of the convictions for which the defendant was on parole were inadmissible but that the Fults could testify to the statement by the defendant, including his status on parole. Because the trial court substantially complied with the requirements of Rule 404(b), Tenn. R. Evid., our standard of review of the trial court's determination is abuse of discretion. *See DuBose,* 953 S.W.2d at 652. At trial, Wayne Fults did not reveal the defendant's parole status during his testimony nor did he mention the car parts ring. It was questioning by defense counsel that elicited the defendant's involvement in the car parts ring and the defendant who revealed his prior convictions during direct examination. Only after the defendant testified regard-

ing his prior criminal record did the state inquire about his parole status. The trial court did not abuse it's discretion by ruling that the defendant's statement to Fults, including the reference to parole, was admissible to prove his motive. Any error that may have occurred by mention of the car parts ring is not attributable to the trial court's ruling. Tenn. R.App. P. 36(a).

### Burglary and Theft

The defendant contends that the trial court erred by admitting evidence of his involvement in the burglary of Caldwell's residence and theft of his truck just two days before the murders. The defendant asserts that this evidence constituted inadmissible character evidence. The state responds that it did not present evidence of the defendant's actual involvement in the burglary and theft.

At a pretrial hearing, the trial court ruled that this evidence was inadmissible unless the state could provide at trial a more concrete connection linking the burglary and theft to the murders. The state had contended that the burglary and theft were part of a common scheme or plan to deter Caldwell from talking to the police. At trial, a note implicating the defendant in the burglary and theft was admitted into evidence and passed to the jury without objection by defense counsel. Defense counsel objected later, claiming he had been "momentarily distracted." The state offered to introduce all of the defendant's pretrial statement in order to link the note to the murders. The trial court, observing that it was caught in a dilemma, ultimately ruled that if the state placed the defendant's entire statement in evidence, the note would be admissible because it would serve to prove a motive for the defendant to kill Caldwell:

> [T]he Court does believe that especially in light of the State's willingness now to put in the Defendant's full statement about these matters, which shows that the Defendant did, in fact, know about the note and what the note said, and

that the victim knew what the note was about. I mean, obviously, it shows he knew about this whole issue, and all that together makes it a matter that is relevant to the state of mind of the Defendant and the relationship between the Defendant and the victim, from which the jury should be able to consider that with all the other evidence, whether or not this case has been proven. I think it's legitimate evidence on that issue and I don't think that the prejudicial value outweighs the probative value, although it is a close case.

 Technically, this issue is waived. *See* Tenn. R.App. P. 36(a). Under Rule 404(b), the defendant has the burden of requesting a jury out hearing. *See* Tenn. R. Evid. 404(b). When the state introduced the handwritten note, there was no objection from defense counsel and no request for a jury out hearing. Even on the merits, there was no error. We agree that the evidence was probative of motive, which was a material issue at trial. Given the lack of forensic evidence linking the defendant to the murders, the probative value of evidence tending to prove why the defendant committed the crime was high. The defendant was provided an opportunity to explain the note and denied any involvement in the burglary and theft. The state presented no additional proof that the defendant committed these crimes. In consequence, the probative value was not outweighed by a danger of unfair prejudice.

### Aggravated Assault

 Lastly, the defendant contends that the trial court erred by permitting the state to question Ms. Morrison about shots fired at her trailer. The state responds that the defendant opened the door for the testimony, that the testimony was not prejudicial because the state did not identify the defendant as the perpetrator, and that the proof was offered to rebut evidence presented by the defense.

■ In a pretrial hearing, the trial court ruled that evidence of the shooting incident at Ms. Morrison's trailer, only days before the murder, was inadmissible at trial because it was irrelevant to the murders and was a prior bad act of the defendant. *See* Tenn. R. Evid. 404(b). The defense theory at trial was that Wayne Fults killed the victims and that robbery was his motive. The defense called Fults and questioned him about a statement he made to the defendant in Whitwell the afternoon after the murders. Fults testified that while he waited for the defendant in Whitwell, he "thought" he had heard a report over the police scanner that someone had "taken a shot" at Ms. Morrison. Fults denied that he had fabricated the report. The defense then called Ms. Morrison and during cross-examination, the prosecutor questioned her about the November 12th shooting incident at her trailer. Defense counsel did not object until well into her testimony. Defense counsel maintained that this evidence had been ruled inadmissible at the pretrial hearing. The trial court, however, determined that the defendant had opened the door to the testimony by questioning Wayne Fults. Following the jury out hearing, the state did not question Ms. Morrison further about the incident. In our view, defense counsel opened the door for the state to question Ms. Morrison about shots fired at her trailer. Tenn. R.App. P. 36(a). Fults denied fabricating the report and Jerry Hutchins, supervisor of communications at the sheriff's department, testified that a radio call between officers could have been made on the 14th although he had no record of it. Prejudice, if any, resulting from this testimony was marginal as Ms. Morrison never identified the defendant as the perpetrator of the incident. Finally, the state was entitled to rebut the defense theory that Wayne Fults had fabricated the incident. The admission of rebuttal evidence rests within the sound discretion of the trial court and the trial court's ruling will not be reversed unless there is a showing of an abuse of that discretion. *State v. Braden,* 867 S.W.2d 750, 760 (Tenn.Crim.App.1993). This issue has no merit.

V

The defendant also complains that the cumulative effect of all of these errors requires reversal. Because we have found no merit to any of his claims of error. We need not address any possible cumulative effect.

VI

*On* January 11, 1997, the trial court imposed concurrent life sentences. The defendant was ineligible for bail. On January 27, 1997, the defendant filed a motion for a new trial. On February 1, 1997, the state filed a motion to set aside the judgment and to rehear sentencing, contending that the trial court should have imposed consecutive life sentences. The state also argued that the sentences should be consecutive to a prior federal sentence for which the defendant had been on parole. On April 16, 1997, following the new trial hearing, the trial court heard the state's argument for amending the manner of service of the sentences. On the next day, the trial court entered a written order requiring the defendant to serve the life sentences consecutively to one another and to the federal sentence.

■ The defendant argues that the sentence is excessive and that the trial court's order amending the manner of service of the sentence is barred by principles of double jeopardy. An early opinion of the United States Supreme Court has been interpreted by this court as barring an increase in sentence once the defendant has begun to serve the sentence. *Tinker v. State,* 579 S.W.2d 905 (Tenn.Crim.App. 1979); *Ex parte Lange,* 18 Wall. 163, 85 U.S. 163, 21 L.Ed. 872 (1873). In *Lange,* the United States Supreme Court reasoned as follows:

[I]f, after judgment has been rendered on the conviction, and the sentence of

that judgment executed on the criminal, he can be again sentenced on that conviction to another and different punishment, or to endure the same punishment a second time, is the constitutional restriction [against double jeopardy] of any value? . . .

. . . [W]e do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offense as from being twice tried for it.

85 U.S. at 173. Subsequent to the decision in *Tinker*, however, the United States Supreme Court clarified, in dicta, that the holding in *Lange* had been largely misinterpreted by courts. *United States v. DiFrancesco*, 449 U.S. 117, 138, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). The Supreme Court limited application of *Lange* to instances in which a defendant had satisfied one of two alternative punishments. *Id.;* Joseph G. Cook, *Constitutional Rights of the Accused* § 29:30 (3d ed. 1996 & Supp. 1998). In *DiFrancesco*, the Supreme Court summarized the general principles that had emerged from state and federal court interpretations of the double jeopardy clause, in particular that an acquittal following a trial is "accorded special weight." 449 U.S. at 127–32, 101 S.Ct. 426. The high court held that neither history, nor the practice of courts in sentencing, nor the decisions of the Supreme Court. required that a sentence once imposed be afforded constitutional finality equal to that of an acquittal. *Id.* at 132, 101 S.Ct. 426. Hence, we conclude *Tinker* is no longer persuasive and decline to apply its rule. *See generally*, Lee R. Russ, *Power of State Court, During Same Term, to Increase Severity of Lawful Sentence— Modern Status*, 26 A.L.R.4th 905 (1983 & Supp.1998); *but see State v. Hill*, 987 S.W.2d 867, 871 n. 4 (Tenn.Crim.App. 1998).

■ It is well settled that when the length, range or manner of service of a sentence is disputed, the trial court is required to conduct a sentencing hearing.

"Before imposing sentence or making other disposition . . . upon a verdict or finding of guilty, the court *shall* conduct a sentencing hearing." Tenn.Code Ann. § 40–35–209(a) (emphasis added). A sentencing hearing is "require[d] in all felony cases except where the parties have agreed to the sentence and in capital cases." Sentencing Commission Comments. Here, the trial court did not conduct a sentencing hearing, no presentence report was ordered or prepared, the state did not submit proof to provide a basis for consecutive sentences, and the defendant was denied an opportunity to present witnesses. In consequence, we must remand this matter for resentencing. A presentence report shall be prepared and a hearing conducted to determine the manner of service of the life sentences, according to the requirements and principles established in the 1989 Act.

■ In a related matter, the trial court ordered the defendant to serve his life sentences consecutively to his prior felony sentence for which he had been granted parole. While we have remanded for a sentencing hearing, we have concluded that, as a matter of law, the life sentences must be served consecutively to the sentence for which the defendant was on parole. Rule 32(c)(3)(a), Tenn. R.Crim. P., provides as follows:

Mandatory Consecutive Sentences. Where a defendant is convicted of multiple offenses from one trial or where the defendant has additional sentences not yet fully served as the result of the convictions in the same or other court and the law requires consecutive sentences, the sentence shall be consecutive whether the judgment explicitly so orders or not. This rule shall apply:

(a) To a sentence for a felony committed while on parole for a felony.

Accordingly, the judgments of conviction are affirmed. We remand for a resentenc-

ing determination on the manner of service of the life sentences.

PEAY and SMITH, JJ., concur.