IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2001

## STATE OF TENNESSEE v. LUKE B. COLE

**Appeal from the Criminal Court for Shelby County**
**No. 98-09236      W. Otis Higgs, Judge**

---

**No. W2000-01530-CCA-R3-CD  - Filed August 10, 2001**

---

The Defendant, Luke B. Cole, was convicted by a jury of second degree murder in the shooting death of David Burson.  The trial court sentenced the Defendant as a Range I, violent offender to twenty years incarceration.  In this appeal as of right, the Defendant contends that the trial court erred in ruling admissible certain photographs of the victim; that the trial court erred in admitting certain rebuttal evidence submitted by the State; and that his sentence is excessive.  Finding no reversible error in the Defendant's trial, we affirm his conviction.  Finding that the trial court erred in sentencing the Defendant, we modify his sentence to seventeen years.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN, J. and L. T. LAFFERTY, SR.J., joined.

Tim Albers, Memphis, Tennessee, for the appellant, Luke B. Cole.

Paul G. Summers, Attorney General and Reporter; Laura E. McMullen, Assistant Attorney General; William L. Gibbons, District Attorney General; and Camille McMullen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On the evening of August 23, 1996, the nineteen-year-old Defendant and his girlfriend, Samantha Sharpe, returned to the Defendant's home from an outing.  They were sitting in the living room when someone pulled into the driveway.  The Defendant stood up; Ms. Sharpe remained seated. David Burson entered the house, yelling "Get those f'ing cars out of the driveway."  Burson also lived in the home with the Defendant's mother, and he had earlier told Ms. Sharpe that he did not want her parking in the driveway.

The Defendant told Burson to shut up, and Burson responded by throwing a twelve-pack of beer in Ms. Sharpe's direction, hitting her in the head. The Defendant took umbrage and the two men began "tussling" in the living room. They fell to the floor and knocked over some furniture. The struggle continued for a short time. When the two men broke up, the Defendant walked into his bedroom and shut the door. Ms. Sharpe testified that she saw Burson "bent over picking something up."

Ms. Sharpe left the house to move her car. While in that process, she testified, she heard "a loud pop." The Defendant came out a short time later, looking "shocked and scared." Ms. Sharpe observed blood spots on the Defendant's shirt and face. The Defendant told Ms. Sharpe that she needed to go and that he had shot Burson. When she asked the Defendant why he had done so, Ms. Sharpe testified, the Defendant responded, "[H]e pulled a knife on me."

The Defendant called 911 for assistance. When the police arrived, the Defendant cooperated and was taken into custody. He also signed a consent to search form, and the police searched the house. They found the shotgun used to kill Burson in the Defendant's bedroom closet, covered with a jacket. They also found several other guns in the house, some of which belonged to Burson.

Dr. O'Brian Cleary Smith performed the autopsy on Burson's body and testified that he had been killed by a shotgun wound entering the mouth. Dr. Smith testified that the shot had been fired "certainly within . . . eighteen inches . . . [but] most likely within six inches." Two photographs taken of the victim's face were admitted with Dr. Smith's testimony which showed the extent of the wound. Dr. Smith also testified that the victim's blood alcohol content was .17.

The police found the victim sprawled on the living room floor with a knife in his left hand. Paulette Sutton, a forensic serologist and bloodstain pattern expert, testified that, based on photographs of the crime scene, it was her opinion that Burson had been upright when he was shot in the vicinity of the Defendant's bedroom doorway. She opined that the body had been moved from the place where it had originally fallen. She further opined that the knife had not been in the victim's hand when he was shot.

The Defendant testified and admitted that he had shot Burson, moved his body, and placed the knife in Burson's hand. He explained that, during their "tussle," Burson had placed his knee on the Defendant's chest and a hand on his throat, and then pulled a pocket knife out of his pocket. Burson was "slicing" at the Defendant with the knife while the Defendant "was swatting it away." The Defendant hit Burson in the throat, making Burson drop the knife. The Defendant then got out from under Burson and got up and went into his bedroom, shutting the door behind him. The Defendant testified that he quickly loaded his shotgun because he was afraid Burson was going to come after him. When he heard Burson at his bedroom door, he told Burson "not to enter the room because [he] had a gun." Burson then opened the door, the Defendant testified, and "had his [right] hand up in the air with a knife in it." The Defendant "defended [him]self" and shot Burson.

The Defendant testified that he thought Burson was attacking him and that he shot Burson because he "was afraid of him." The Defendant explained that he "was trying to protect [himself] because [Burson] had pulled guns on [him] on various occasions." The Defendant testified that he moved Burson's body in an effort to determine his condition because he could not see the wound where Burson originally lay. He explained that he put the knife in Burson's hand because he was scared and did not think anyone would otherwise believe that Burson had been attacking him. The Defendant testified that he and Burson were approximately five feet apart when he fired the shot.

Janet Cole, the Defendant's mother, testified that she and Burson were engaged to be married. She and Burson had been drinking prior to arriving home on the evening of August 23. When they arrived home, she testified, Burson went into a rage because of the cars in the driveway. She told him to go in, go to bed, and calm down; she then left, returning about forty-five minutes later, after Burson had been shot. Cole testified that Burson had a drinking problem and that he had become violent in the past. She testified that Burson kept his guns under their bed in the master bedroom of the house.

On rebuttal the State called the court reporter to certify a page of transcript from the Defendant's testimony on direct examination and to testify concerning a portion of that page of transcript.

## ADMISSION OF PHOTOGRAPHS

During Dr. Smith's testimony the State tendered two photographs of the victim's face taken during the autopsy. The photographs graphically demonstrated the extent and nature of the gunshot wound which killed the victim. Defense counsel objected to the admission of these photographs, arguing that they were unnecessary, that they would inflame the jury, and that their probative value was substantially outweighed by the danger of unfair prejudice. The trial court disagreed, finding the photographs "significant and relevant [in] that the jury is able to see the powder burns on [the victim's] face and . . . then in addition to that the manner in which the man was killed in the face. . . . [I]t might even go to the defendant's state of mind." The Defendant now contends that the trial court's ruling was harmful error.

We respectfully disagree. "The admissibility of relevant photographs . . . of . . . victims is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion." State v. Carruthers, 35 S.W.3d 516, app. 576 (Tenn. 2000). "Moreover, the modern trend is to vest more discretion in the trial judge's rulings on admissibility." Id. at app. 577.

The two photographs at issue graphically illustrated Dr. Smith's testimony about the manner of death and the short distance from which the shotgun was fired. Thus, the photographs were relevant and, therefore, generally admissible. See Tenn. R. Evid. 401, 402. We acknowledge that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, . . . or by considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403. However, "simply because evidence is prejudicial does not mean the evidence

-3-

must be excluded as a matter of law." Carruthers, 35 S.W.3d at app. 577. It is the trial court's responsibility to determine the relevance of the photographs and to weigh the probative value against any undue prejudice. Id.

We agree with the trial court that the photographs at issue were relevant to proving how the Defendant killed the victim. "Photographs showing the injuries of the victim are properly admitted if the defendant admits he killed the victim but seeks to show a non-criminal homicide or that the offense was of a lesser degree than murder." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Here, the Defendant claimed to have shot and killed the victim in self-defense. He claimed to have been several feet away from Burson when he fired his shotgun. Dr. Smith's testimony, together with the photographs, constituted proof that the Defendant shot the victim from only a few inches away. See State v. Keen, 31 S.W.3d 196, app. 231 (Tenn. 2000) ("[P]hotographs may be introduced in order to illustrate testimony . . . [and] a relevant photograph is not rendered inadmissible merely because it is cumulative.") (citations omitted). Moreover, we do not think that admission of the instant photographs unfairly prejudiced the Defendant or amounted to unduly cumulative evidence. The photographs, while certainly unpleasant to view, are not unduly gory or gruesome: they merely illustrate what the Defendant did to the victim. The photographs were taken after the victim had been moved to the morgue and illustrate only the condition of the victim's face. These photographs were properly admitted. See Keen, 31 S.W.3d at app. 231 (finding the postmortem photograph of the victim "relevant to supplement and clarify the testimony of the medical examiner and the officer in establishing the cause of death"); State v. Schafer, 973 S.W.2d 269, 274-75 (Tenn. Crim. App. 1997) (photograph of victim showing gunshot wound properly admitted where used to prove that the gunshot had been fired at very close range). The Defendant having failed to demonstrate that the trial court abused its discretion in admitting the photographs, this issue is without merit.

REBUTTAL EVIDENCE

The Defendant next contends that the trial court erred in allowing the State to call the court reporter as a rebuttal witness in order to testify about a portion of the Defendant's testimony on direct examination. During direct examination, defense counsel asked the Defendant, "So what did you do then after you loaded [the shotgun]?" The Defendant responded, "I just sat in my room." On cross-examination, the prosecutor stated to the Defendant, "And when you got to your room you sat on the bed," to which the Defendant responded, "No, ma'am." A few questions later, the prosecutor again stated, "And you sat on your bed." Again the Defendant replied, "No, I didn't sit on my bed." Later, the prosecutor again attacked the subject of what the Defendant did after he entered his bedroom: "Now, correct me if I'm wrong, Mr. Cole. On your direct testimony did you just not tell this jury that you went back inside your room, loaded your gun, and sat on the bed?" Once again, the Defendant stated, "I didn't say I sat on the bed."

On rebuttal the State called the court reporter and asked her to read that portion of the Defendant's direct examination in which he stated, "I just sat in my room." Apparently the prosecutor was trying to point out an inconsistency in the Defendant's direct testimony, thereby impeaching his credibility. On cross-examination, defense counsel requested the court reporter to read the remaining questions and answers that were transcribed on that page, which she did. These

responses included the Defendant's direct testimony that he told the victim not to enter his bedroom because he had a gun, that the victim then opened the door, and that the victim at that time "had his hand up in the air with the knife in it."

Rebuttal evidence "is that which tends to explain or controvert evidence produced by an adverse party." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). It is "properly admitted for the purpose of impeaching a witness through the use of a prior inconsistent statement." State v. Braden, 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993). The admissibility of rebuttal evidence lies within the sound discretion of the trial court, and this Court will not overturn a trial court's admission of rebuttal proof unless it is clear on the face of the record that an abuse of discretion has occurred. Id.

Where a witness denies having made a prior inconsistent statement, his or her credibility may be impeached through the admission of the statement. See State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). Here, the State was trying to do just that: to show that the Defendant had stated on direct examination that he had sat on his bed after having loaded his gun, which he denied stating on cross-examination. The State's effort failed because the Defendant's denial was accurate: he never testified that he had sat "on his bed." The State's "rebuttal" evidence merely served to underscore the State's own misunderstanding of the Defendant's direct testimony. Therefore, whether or not the so-called rebuttal evidence was, in fact, worthy of admission as rebuttal proof, we find any error in its admission to be harmless. Indeed, it gave defense counsel the opportunity to put before the jury a second time the Defendant's self-defense theory. This issue is without merit.

SENTENCING

In his final issue, the Defendant contends that his sentence is excessive. He argues that the trial court misapplied an enhancement factor and failed to give sufficient weight to three applicable mitigating factors. The State disagrees.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Thus, in order to allow meaningful appellate review,

> the trial court "must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence."

State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Brewer, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Second degree murder is a Class A felony. See Tenn. Code Ann. § 39-13-210(b). The Range I sentence for a Class A felony is fifteen to twenty-five years. See id. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is midpoint in the range, enhanced by applicable enhancement factors and reduced by applicable mitigating factors. See id. § 40-35-210(c), (e).

The trial court applied two enhancement factors: that the personal injuries inflicted upon the victim were particularly great and that the Defendant employed a firearm during the commission of the offense. See id. § 40-35-114 (6), (9). The Defendant contends that the trial court's application of the first of these two factors was error, and the State correctly concedes. A sentence cannot be enhanced by a factor which is itself an essential element of the offense. See id. § 40-35-114. Given that the victim's death is an element of the crime of second degree murder, the enhancement factor for inflicting particularly great personal injuries cannot be applied to enhance a sentence for a murder conviction. See, e.g., State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (holding that the enhancement factor for inflicting particularly great injuries cannot be applied to enhance a sentence for vehicular homicide "because the death of the victim is an element of the offense"); State v. James Henry Davis, No. M1999-02467-CCA-R3-CD, 2000 WL 1130139, at *3 (Tenn. Crim. App., Nashville, Aug. 2, 2000) (holding that this enhancement factor cannot be applied to a sentence for second degree murder because "the personal injuries inflicted upon the homicide victim are by definition 'particularly great'"). Thus, the trial court erred when it applied this enhancement factor to increase the Defendant's sentence.

The trial court also applied three mitigating factors: that the Defendant acted under strong provocation; that, because of his youth, he lacked substantial judgment in committing the murder; and that, although guilty of the crime, the Defendant committed the murder under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct. See Tenn. Code Ann. § 40-35-113 (2), (6), (11). The trial court further noted that the Defendant had no

prior felony convictions.[1] The State argues that the trial court should not have applied the first of these factors because the jury rejected the Defendant's self-defense theory. We respectfully disagree. "Strong provocation" is not synonymous with self-defense, and the proof supports the application of this mitigating factor.

Because the trial court did not place its findings on the record other than by filing a "Findings of Fact" form, we are unable to discern the weight given to any of the enhancement and mitigating factors. As we have noted, the trial court erroneously applied one enhancement factor. Accordingly, we review the trial court's sentencing decision without the presumption of correctness. See, e.g., State v. William Lewis Houston, No. M1999-01430-CCA-R3-CD, 2000 WL 1793088, at *9 (Tenn. Crim. App., Nashville, Dec. 7, 2000) (holding that, "[s]ince the trial court did not articulate how each of the alleged enhancement factors applies, we must review the defendant's sentence de novo without any presumption of correctness"). Upon the record before us, we find that the Defendant's sentence should be less than twenty years. Beginning at the midpoint of the range, which is twenty years, enhancing on the basis of a single enhancement factor, and then reducing the sentence on the basis of three mitigating factors, the appropriate sentence should be somewhat below the midpoint of the range. We believe that each of the three mitigating factors is entitled to significant weight in this case. Accordingly, we modify the Defendant's sentence to seventeen years.

The Defendant's conviction is affirmed. His sentence is reduced to seventeen years.

 

_____
DAVID H. WELLES, JUDGE

---

[1] The Defendant's presentence report indicates that he has no prior record of either adult or juvenile criminal activity.