IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2009

**STATE OF TENNESSEE v. CHARLES HALL**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-00119     James M. Lammey, Jr., Judge**

———————————

**No. W2008-01883-CCA-R3-CD  - Filed December 9, 2009**

———————————

On November 8, 2007, a Shelby County jury convicted the defendant, Charles Hall, of two counts of aggravated robbery.  The trial court sentenced him to life without parole as a repeat violent offender.  On appeal, the defendant submits that the trial court erred in (1) admitting prior convictions for aggravated robbery for impeachment purposes and (2) denying the defendant's motion for mistrial.  Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Brooks, Memphis, Tennessee, for the appellant, Charles Hall.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Williams L. Gibbons, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

A Shelby County Grand Jury charged the defendant with two counts of aggravated robbery in indictment 04-00119 and two counts of aggravated robbery in indictment 04-00120.  The original trial court consolidated the indictments for trial over the defendant's objection.  The jury convicted the defendant, and the trial court sentenced him to consecutive life sentences.  Upon appeal, this court found that the trial court erred in consolidating the indictments and remanded the matter to be tried as two separate trials.  *See State v. Charles Hall*, No. W2005-0138-CCA-CD, 2006 WL 2334850 (Tenn. Crim. App. at Jackson, Aug. 11, 2006).

Prior to trial, the defendant requested a hearing on the admissibility of the defendant's prior convictions for impeachment purposes.  The state presented ten aggravated robbery convictions it

intended to use to impeach the defendant should he decide to testify. The trial court found that aggravated robbery was a crime of dishonesty under Tennessee Rule of Evidence 609. The court initially ruled that the defendant's 1989 convictions, six from Tennessee and one from Mississippi, were within the ten-year period required by Rule 609 because the defendant was released from custody in 2001. The court found "that the probative value of the convictions substantially outweigh[ed] the prejudicial effect on the issue of credibility," and the court would give the jury "a curative instruction that they cannot - and [he would] underline 'not' and emphasize the word 'not' [-] use this for anything other than judging credibility."

The defendant also moved the court to suppress evidence of a CrimeStopper's tip that the police used when including the defendant in a photospread. After a suppression hearing, the trial court directed "the state to instruct their witness to use the words, '[b]ased upon information received,' . . . because that can be any type of information."

**Trial**

Janice Gordon testified that on February 20, 2003, she was sitting in her car outside the bank where she was a teller when a man she identified as the defendant approached her car. He was "sticking a gun at [her] and cussing and telling [her] to get out of the car and, 'Give me the keys.'" Ms. Gordon testified that the gun was a silver revolver without a hammer. She said that she got out of the car, and he walked her around to the passenger's side. She noticed another man standing behind the car who got into the backseat. The man who got into the backseat never said anything, nor did he display a weapon of any kind. The defendant got into the car on the driver's side and continued to point his gun at her, demanding that she turn over her keys. Ms. Gordon thought he wanted the bank keys, so she told him she only had her car keys. He also demanded her jewelry and money. She gave him her engagement and wedding rings, a diamond cluster ring, a watch, a charm bracelet, and a $20 bill. He held her car key with a latex glove when he put the key in the ignition. Ms. Gordon jumped out of the car when he put it into reverse and started running to a building next door. She looked back towards her car and observed it turning from Madison Avenue onto Tucker Street, going north. She then ran to the bank, locking the doors behind her and calling the police.

When the police arrived, she described the man who robbed her as about six feet, two inches tall. She was unable to tell his weight or age. He was wearing a "pumpkin-colored" jacket with a strap that covered his lower face. (V, 185) The police found her car later that morning. Ms. Gordon testified that a couple of weeks later, the police showed her a photospread. The photospread came with instructions that she was not to make an identification unless she was positive that she was choosing the man who robbed her. She used two pieces of paper to crop each photo so she could see only the person's eyes. From that photospread, she identified the defendant as the man who robbed her. She later identified the defendant during the preliminary hearing and at a later criminal proceeding. In May of 2003, the police told her that her jewelry might be at Keller's Pawn Shop in Mississippi. She went to the pawn shop by herself and identified her engagement ring and diamond cluster ring. Ms. Gordon identified the defendant in the courtroom as the man who robbed her on February 20, 2003.

Ms. Gordon testified that she had been working in the banking business for over thirty years. During that time, she received training on how to respond to robberies, including how to identify the

robbers. Professionals came to the bank to train employees at least five times, and every month, the employees reviewed robbery procedures. Ms. Gordon testified that her bank had been robbed seven to nine times, and three of those times, she was the specific teller that the robbers approached. She had seen photospreads in connection with those robberies. Sometimes, she was able to make an identification from the spreads, but other times, she was not able to do so.

On cross-examination, Ms. Gordon testified that, to her knowledge, she had not misidentified anyone from a photospread before, but she had once misidentified someone in a training exercise. She said that her training included techniques for making identifications, such as noting individual characteristics of a person's face. She did not notice anything unusual about the defendant's face, nor did she see any scars near his eyes. She said that she only paid enough attention to the man in the backseat to notice what he was wearing. Concerning the weapon used during the robbery, Ms. Gordon had testified at the preliminary hearing that it was an automatic pistol. She stated that part of her training at the bank was identifying weapons, and she knew that automatic pistols did not have hammers but thought revolvers did have hammers. Ms. Gordon did not recall telling a police officer that the man who robbed her had the gun in the waistband of his pants, nor did she remember telling him that the man's jacket was rust colored. Furthermore, she did not recall calling the police to correct their report.

On redirect examination, Ms. Gordon testified that she picked out the defendant's picture in the photospread because she was certain that he was the one who robbed her. No one indicated which picture she should choose.

Detective Milton Gonzalez testified that he was a patrol officer with the Memphis Police Department in February 2003 when he received a call that a blue Grand Marquis had been taken in a carjacking. He responded to the bank, but because an officer was at the scene with Ms. Gordon, he drove around the area to look for the Grand Marquis. He spotted the car "a quarter of a block from Madison and Tucker." He approached the car, which was unoccupied, and observed a $20 or $10 bill and a wallet on the driver's seat. He secured the scene, called for the crime scene unit, and remained by the car until the unit arrived.

Cham Payne testified that he worked for the Memphis Police Department for over thirty years and was with the crime response unit in February 2003. When he responded to the scene of this case, he photographed the car and dusted for latent fingerprints. Mr. Payne testified that he was unable to lift any prints from the car, including Ms. Gordon's prints.

Sergeant James Mack, employed by the Memphis Police Department, testified that he showed Ms. Gordon a photospread on February 21, 2003 that did not include the defendant. Sergeant Mack testified that Ms. Gordon did not identify the man who robbed her from the photospread that he showed her. On cross-examination, he could not recall whether Ms. Gordon used pieces of paper to crop the photographs in the spread.

Sergeant J.B. Bell, Jr., of the Memphis Police Department, testified that he was the investigating officer in the robbery of Janice Gordon. He assisted Sergeant Mack with the first photospread, and then he put together a second photospread that he showed Ms. Gordon in March

2003. He put together the second photospread because "[he] had information from other sources about the suspect in [his] particular case."

In a bench conference, defense counsel objected to the sergeant's use of the word "sources" rather than "based on information received," and moved for a mistrial. The court ruled that the language was "substantially the same" and denied the motion. The examination of Sergeant Bell then resumed.

Sergeant Bell described the process that he used to put together the photospread. He began with a photograph of the defendant, and from a file of pictures that his unit used to create photospreads, he collected pictures of other men with the same skin color, hairline, and facial structure. He excluded any pictures of men who had defining characteristics such as earrings. He presented Ms. Gordon with the photospread at her bank, and she read the instructions on how to use the photospread, which she signed and dated. He said that she asked his permission to use paper to crop the pictures. After she cropped each picture and looked at the spread for ten to fifteen minutes, she identified the defendant as the man who robbed her. She circled the photograph and wrote on the back what he did to her. Sergeant Bell testified that he did not give her "any indication or hint" that she should choose the defendant.

After Ms. Gordon made the identification, Sergeant Bell began looking for the defendant. He arrested the defendant at his workplace on March 13, 2003. Sergeant Bell stated that Sergeant Woodard assisted him in the investigation by giving him "the information that he received which indicated a suspect in the case." Defense counsel objected and moved for a mistrial. The court denied the motion because "[h]e [did not] say where the information came from . . . ." The examination of Sergeant Bell then continued.

Sergeant Bell testified that after the defendant's arrest, he spent several minutes talking to the defendant and did not notice anything unusual at that time about the defendant's eyes. Sergeant Bell stated that he had the opportunity to observe the defendant at an earlier court proceeding from a distance of approximately two feet. At that time, he observed a small scar in the defendant's eye that he "really had to look at it to see it." On cross-examination, Sergeant Bell testified that he had never paid attention to a scar above the defendant's nose.

Lieutenant William Woodard, of the Memphis Police Department, testified that he was working with Sergeant Bell in the robbery bureau in 2003. Lieutenant Woodard stated that he searched the database of pawn shops in Shelby County for the jewelry taken in the robbery but was unsuccessful. After the defendant's arrest, he contacted authorities in DeSoto County, Mississippi. The DeSoto County authorities matched some of the jewelry taken from Ms. Gordon with pieces at Keller's Pawn Shop. Lieutenant Woodard contacted Ms. Gordon, who went to Keller's and identified her jewelry. On cross-examination, he testified that two pieces of jewelry were located at Keller's Pawn Shop.

Scot Keller testified that he worked at Keller's Pawn Shop. In 2003, he received a call from the police asking him to hold two diamond rings and allow Ms. Gordon to identify the pieces. Mr. Keller identified the envelopes that his shop used to hold the rings, which were marked with the

defendant's name as the person who pawned them. In addition to the defendant's name, the envelopes described the person who pawned the items as a black male, six feet, two inches in height. Mr. Keller testified that the defendant pawned the engagement ring on February 26, 2003 and the cluster ring on March 8, 2003. He identified the defendant in the courtroom as the man who pawned the rings. Mr. Keller testified that the defendant visited Keller's Pawn Shop one to two times a week between May 2001 and March 2003, pawning sixty-five to seventy different items. Mr. Keller never noticed anything different about the defendant's eyes. He had the opportunity to hear the defendant speak when the defendant visited the shop. Mr. Keller testified that the defendant called him to redeem the rings after Ms. Gordon had already identified them. He recognized the defendant's voice, and the defendant identified himself by name.

On cross-examination, Mr. Keller testified that his pawn shop was on the road to the casinos in Tunica, and sometimes, people would pawn items in order to get gambling money. He stated that his shop keeps both computerized and paper records, and they email their records to the police every night. Mr. Keller agreed with defense counsel that a pawn shop would "be a very bad place to try to fence stolen goods" because of the high likelihood of getting caught. Mr. Keller testified that the defendant often pawned and redeemed the same item repeatedly, including a lawnmower. Mr. Keller said that nothing the defendant had previously pawned had turned out to be stolen before.

On redirect examination, Mr. Keller testified that eight times the defendant did not redeem an item he had pawned. He further testified that he did not have any personal knowledge regarding whether the items pawned by the defendant were stolen or not.

The state rested its case, and the defendant moved for a judgment of acquittal, which the court denied. The defendant asked for a final ruling on which prior convictions the state could use for impeachment purposes. The state submitted that the defendant had ten prior convictions for aggravated robbery that it intended to use for impeachment: one from Tennessee in 1965, one from Tennessee in 1969, one from Arkansas in 1980, six in Tennessee from 1989, and one in Mississippi from 1989. The defendant was released from the 1980 conviction in August of 1988 and from the 1989 convictions in 2001. The court ruled that the defendant's convictions from 1980 and 1989 could be used for impeachment purposes, finding that the state had given adequate notice to the defendant, that the use of the evidence was in the interest of justice, and that the probative value substantially outweighed the prejudicial effect on the issue of the defendant's credibility. Additionally, the court ruled that the defendant's 1965 and 1969 convictions were inadmissible because they were too far removed, the release dates were uncertain, and "the probative value may be outweighed by the prejudicial effect to go any further than [the eight other convictions]." The court conducted a *Momon* hearing, and the defendant elected not to testify.

The defense called Lakeia Johnson to testify that the defendant was with her on the morning of the robbery. Ms. Johnson testified that she is the second cousin of the defendant and that he was living with her and her grandmother, Lelah Johnson, on February 20, 2003. Her grandmother was deceased at the time of trial. She said that when she went into the kitchen around 6:15 or 6:30 that morning, the defendant was asleep on the couch in the adjacent room. The defendant woke up, and they had a conversation. He then went back to sleep, and Ms. Johnson left the house "no later than 9:00."

Ms. Johnson testified that the defendant was working full time at a security company in February, 2003. She said that he had a red spot in his left eye that was "real noticeable." He also had a scar on his forehead. Ms. Johnson testified that the defendant had the red spot and scar for as long as she had known him. She did not know whether the defendant was left or right handed. Ms. Johnson said that she did not contact anyone to tell them that the defendant was with her on the day in question because she assumed someone would contact her.

On cross-examination, Ms. Johnson testified that she remembered the morning of February 20, 2003, because the defendant gave her a birthday gift of $50 that day, which was two days before her birthday. She did not know which day of the week that February 20 fell on and could not recall whether she went to work that day. Ms. Johnson stated that she found out about the defendant's arrest on March 13, 2003, soon after it happened. She said that she never told anyone from the public defender's office, the police, the state, or any court personnel that the defendant was with her on the morning of February 20 until she told defense counsel. She did not testify in any prior proceedings in this matter.

Georgia Johnson testified that she was the defendant's first cousin. She said that he had a spot in his left eye that he had since he was in his teens and a scar on his forehead that he had for at least fifteen years. Ms. Johnson testified that she knew the defendant was right handed because she grew up with him and would have teased him if he had been left handed. She said that her mother, Lelah Johnson, had a gambling problem, and the defendant would often drive Lelah Johnson to the casinos in Tunica. She testified that she knew he was a gambler because she was with him at the casinos sometimes. Ms. Johnson said that the defendant would go to the casinos once or twice a week and would stay overnight. She did not have personal knowledge of any items that the defendant might have pawned.

On cross-examination, Georgia Johnson testified that she was living at her mother's house when the defendant was arrested in March 2003. She said that the spot in the defendant's eye was "dark red . . . kind of burgundy looking." Ms. Johnson could not remember testifying at the previous trial that it was a "dark spot."

Officer Untrunnis Brandon, with the Memphis Police Department, testified that he interviewed Janice Gordon on February 20, 2003, for an offense report. He could not recall her exact answers or the questions he asked. He said that, at the time, he handwrote offense reports. He would write down what the victim's responses were to certain questions. He would turn in the report, and someone would type it. He did not review the typewritten report for errors and said that the person typing it would sometimes correct errors, such as spelling mistakes. He read Ms. Gordon's report into the record as follows, in pertinent part:

[T]he complainant/victim, Janice Gordon, advised that two male black suspects approached her while she was getting out of her parked car.

The victim advised suspect No. 1 pulled back his coat, showed her a silver handgun in his waistband. The victim advised that [s]uspect No. 1 asked her to open the doors

to the bank, Brighton Bank - the victim works at Brighton Bank. The victim advised that she told the suspects that she did not have the keys to the bank.

On cross-examination, Officer Brandon testified that he has taken hundreds of reports. He does the initial interview and then the case is assigned to a detective. He said that the report he read into the record had been typed by someone else, and he did not review it. The victims in his cases do not have the opportunity to review the report, to his knowledge. He would not know if another officer took a different report, if his report was incorrect, or if the victim had reviewed the report and found an error. Officer Brandon further testified that he did not have any independent recollection of his interview with Ms. Gordon.

On redirect examination, Officer Brandon stated that he remembered speaking with Ms. Gordon, but not the exact words spoken. He recalled writing down her answers to his questions and did not have a reason to believe his report was inaccurate.

Evelyn McGuire testified that she was married to the defendant from 1968 until 1971 and has stayed in periodic contact with him. She said that she believed the defendant was right handed. She testified that the defendant had a discoloration in his eye that was there when they met in 1967. He also had a scar on his forehead. On cross-examination, Ms. McGuire said that she thought they were married on October 8, 1968, but she was "not really sure."

After the testimony was concluded, the jury viewed the defendant from an arm's length distance.

The state called Lieutenant Darren Goods of the Memphis Police Department as a rebuttal witness. Lieutenant Goods testified that he was the supervisor of the police department's robbery bureau in February 2003. He received a call from Janice Gordon on February 28, 2003. She had received a copy of the offense report and wished to make corrections. She gave Lieutenant Goods a description of jewelry taken in the robbery that was not attached to the report. She also told Lieutenant Goods that "when the actual robbery took place, she was inside of a vehicle, and the subject actually approached her with the gun in his hand - not in his waistband as stated in the initial offense report." Lieutenant Goods put Ms. Gordon's corrections in a supplemental narrative that he attached to the case file.

The defendant renewed his motion for a judgment of acquittal, which the court denied. After deliberation, the jury convicted the defendant of two counts of aggravated robbery. The court denied the defendant's motion for new trial, and the defendant now appeals.

**Analysis**

1. Admissibility of Prior Convictions

The defendant contends that the trial court erred in ruling that eight prior aggravated robbery convictions would be admissible should the defendant choose to testify. Specifically, the defendant argues that the trial court did not follow procedure under Tennessee Rule of Evidence 609 and *State*

*v. Mixon* because the court did not consider the similarity of the charge *subjudice* with the prior convictions. Tenn. R. Evid. 609; *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999).

We analyze whether a trial court erred in admitting prior convictions for impeachment purposes under an abuse of discretion standard. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). "A trial court abuses its discretion only when it 'appl[ies] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Id.* (citing *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999))

Rule 609 of the Tennessee Rules of Evidence permits the defendant's credibility to be impeached by prior criminal convictions on cross-examination if certain conditions and procedures are satisfied. The conviction must be for a crime (1) punishable by death or incarceration in excess of one year, or (2) involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). The state is also required to give reasonable written notice prior to trial of the particular convictions it intends to use to impeach the defendant. Tenn. R. Evid. 609(a)(3). Before permitting the use of a prior conviction, the trial court must find that the probative value of the conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. *Id.* Generally, convictions that are ten years old or more cannot be used for purposes of impeachment. Tenn. R. Evid. 609(b). If the prior convictions do not qualify under Rule 609(b)'s time limitation, the state has given adequate notice, and the defendant has had the opportunity to contest the use of the convictions, then the trial court must "determine[] in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect." Tenn. R. Evid. 609(b) (emphasis added). The trial court shall rule on the admissibility of the prior conviction before the defendant testifies. *Id.* If the court rules that the prior conviction is admissible to impeach, there is no requirement that the defendant testify at trial in order to later challenge the court's ruling on the admissibility of the prior conviction. *Id.*

"The mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." *State v. Baker,* 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citations omitted). However, "[w]hen an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged." *State v. Mixon,* 983 S.W.2d 661, 674 (Tenn. 1999) (citations omitted). Accordingly, trial courts should engage in a two prong analysis when determining if the probative value of the impeaching conviction is outweighed by its prejudicial effect. *Id.* Trial courts are required to expressly (1) "analyze the relevance the impeaching conviction has to the issue of credibility," as well as (2) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id.* (citations omitted).

Prior to trial, the state notified the defendant of ten prior convictions it intended to use, should the defendant testify. The defendant moved the court to rule on the admissibility of the convictions. The trial court made a preliminary ruling that the convictions were crimes involving

dishonesty. After the close of the state's proof, the court held a hearing on the admissibility of the prior convictions. The trial court found that the state had given adequate notice such that the convictions could be admitted under the provision of Tennessee Rule of Evidence 609(b) covering convictions not qualifying under the rule's time limitation. The court found also found that the probative value of the convictions regarding the defendant's credibility substantially outweighed the prejudicial effect because "the defendant has . . . spent most of his adult life serving time on aggravated robbery or robbery with a deadly weapon cases . . . ." (VI, 346) Further, the court ruled that the 1989 and 1980 convictions would be admissible to impeach the defendant if he chose to testify, but the 1965 and 1969 convictions were inadmissible because they "are too far removed, and there's not enough information on those." (VI, 349) After this ruling, the defendant elected not to testify.

The trial court did not consider the similarity between the instant charge and the prior convictions when balancing probative value versus prejudicial effect. *See Mixon*, 983 S.W.2d at 674. While crimes involving dishonesty are probative of the defendant's credibility, the probative value may not always outweigh the prejudicial effect. We conclude that the trial court erred in not considering whether the defendant's prior convictions were so similar that the jury might use the convictions as propensity evidence, but we find that the error is harmless in light of the overwhelming evidence against the defendant. In addition to the victim's multiple identifications of the defendant as the man who robbed her, the owner of the pawn shop identified the defendant as the man who pawned the victim's jewelry. The jury viewed the defendant at a close distance and heard testimony regarding the defendant's alibi, and they resolved the issues in favor of the state. The defendant has not shown that the trial court's error was prejudicial, and he is not entitled to relief on this issue.

## 2. Motion for Mistrial

The defendant argues that the trial court erred by denying his motion for mistrial. Specifically, the defendant contends that Sergeant Bell's use of the term "sources" was not substantially similar to the phrase "based on information received," which the court had ordered the state's witness to use.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. *State v. Land,* 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.; State v. Jones,* 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State,* 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks,* 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold,* 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight,* 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land,* 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.* When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following non-exclusive

factors: "(1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor,* No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., at Jackson, Feb. 14, 2003) (citation omitted).

In this matter, the defendant made a motion *in limine* to suppress any reference to a CrimeStopper's tip that the police used in their investigation and asked the court to limit the investigating officer's testimony to saying that "he acted upon information received." The trial court ordered the state to instruct its witness to use the phrase "based on information received" when explaining why the police included the defendant's photo in a photospread. During Sergeant Bell's testimony, he said that "[he] had information from other sources about the suspect in [his] particular case." The state submitted that it had properly instructed its witness and was surprised by the witness's use of "sources." The trial court denied the defendant's motion for mistrial because the court found that "sources" was substantially similar to "information." The defendant renewed his motion for mistrial after Sergeant Bell said, "Sergeant Woodard gave me the information that he received which indicated a suspect in the case." The trial court denied the motion based on the fact that Sergeant Bell did not say from where the information came.

The trial court found Sergeant Bell's testimony to be proper, and we agree. Sergeant Bell used a different term than the trial court had ordered, but we conclude that the trial court did not abuse its discretion by finding that "sources" was substantially similar to "information" and denying the motion for mistrial. The defendant is not entitled to relief on this issue.

### Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE