# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 24, 2012 Session

## STATE OF TENNESSEE v. MICHAEL L. POWELL
## and RANDALL S. HORNE

**Appeal from the Criminal Court of Knox County**
**No. 91402A      Bob R. McGee, Judge**

---

**No. E2011-00155-CCA-R3-CD - Filed May 10, 2012**

---

A jury convicted Michael L. Powell and Randall S. Horne ("the Defendants") each of one count of aggravated burglary; six counts of aggravated robbery; four counts of especially aggravated kidnapping; two counts of aggravated assault; one count of employing a firearm during the commission of a dangerous felony; and one count of possession of a firearm with intent to go armed during the commission of a dangerous felony. The trial court subsequently merged several convictions of each Defendant and, after a hearing, sentenced each Defendant to an effective term of twenty-four years. In this consolidated appeal, both Defendants challenge the validity of their convictions of especially aggravated kidnapping. Horne also challenges the sufficiency of the evidence on all of his convictions, and Powell also challenges the trial court's imposition of partial consecutive sentencing. Upon our careful review of the record and the recent Tennessee Supreme Court decision in State v. White, __ S.W.3d __, 2012 WL 758916 (Tenn. 2012), we hold that the Defendants' convictions of especially aggravated kidnapping must be reversed and remanded for a new trial. We also are constrained to find plain error with respect to the trial court's instructions to the jury on the firearms offenses, and we must reverse those convictions and remand them for a new trial. Therefore, Powell's challenge to his consecutive sentence is rendered moot. The Defendants' remaining convictions and sentences are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part,**
**Reversed in Part; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

J. Liddell Kirk (on appeal) and Mary Ward (at trial), Knoxville, Tennessee, for the appellant, Michael L. Powell.

Robert L. Vogel (on appeal) and Vanessa Lemons (at trial), Knoxville, Tennessee, for the appellant, Randall S. Horne.

Robert E. Cooper, Jr., Attorney General & Reporter; Cameron L. Hyder, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

During the early morning hours of March 20, 2009, three men invaded the residence of Michael Wayne Mount ("Father") and victimized Father, Father's son, Michael Kaylen Mount ("Son"), and Son's fiancee, Sarah Kubas ("Kubas"). The Defendants each were subsequently charged with the following offenses: aggravated burglary; aggravated robbery by violence as to each of the three victims; aggravated robbery by fear as to each of the victims; especially aggravated kidnapping by confinement as to Son and Kubas; especially aggravated kidnapping by removal as to Son and Kubas; two (alternative) counts of aggravated assault as to Son; employment of a firearm during the commission of a dangerous felony; and possession of a firearm with intent to go armed during the commission of a dangerous felony. The Defendants were tried jointly before a jury in February 2010.

Father, forty-five years old at the time of trial, testified that, in March 2009, he was living with his fiancee Connie Stinnett, his daughter Jamie, his step-daughter Carrie, and his grandson, Austin. Son came by "every so often." On the night in question, Stinnett, Jamie, Carrie, and Austin were all away. Son and Kubas came over and went into the garage to listen to music. Father was in his bedroom and had just taken some of his medicine when he heard a car door. He looked out his window and saw a white car. He got up and, when he opened his bedroom door, he "got hit with a pistol" in his face. Father and his assailant "tussled," and another man entered the bedroom. Both men "beat on" him. Father testified that his lights were on during the attack.

While the attack was taking place, Son and Kubas came back into the house. A third man was standing outside Father's bedroom door. According to Father, Son grabbed this man. When Son then came into the bedroom, "one of them bent over and hit [Son] with a pistol." At that point, Father told Son to "[j]ust let it go." Father testified that Son "backed off" and that Father then "quit fighting with them cause [he] didn't want to endanger [his] son."

While Father's assailants were in his bedroom, they asked him "where Aunt Connie was and where her gold was." The men took "a cigarette case that had $180.00 in it," ten locket sets, and some of Father's medicine. They also took "120 of . . . [Stinnett's] Xanax that

-2-

she had just got . . . [that were] under [his] pillow." They also took several rings off of Father's hand.

Father testified that he saw two guns and that the men threatened to shoot him. As to his attackers, one of them had pulled his shirt up to his nose. Father testified that he was able to identify this man as Michael Powell when his shirt came down from his face. The "other one" was wearing a jacket with a hood and a flap that came across his face. Father said that this man "was the one [he] grabbed a hold of." Although Father did not identify Horne as the "other one" at trial, he testified that he told the police that the two men in his room were Powell and Horne.[1] He also identified the Defendants' photographs to the police. Admitted into evidence were photographs of the Defendants. Under Powell's, Father had written, "this is Michael that came in to my house with a gun." This identification was dated March 24, 2009. Under Horne's photograph, Father had written "Scotty came in to my house whit [sic] a gun." This identification was also dated March 24, 2009. Father identified Horne at trial as "Scotty Horne." Father also acknowledged that he had testified at the preliminary hearing that Powell and Horne had been the men who came into his house.

Father testified that both Powell and Horne had been to his house about a week earlier. They were asking Stinnett about a ring she had, but she would not sell it to them. He explained that Horne was Stinnett's nephew and that he had known Horne "since he was little."

Father also testified that two of the intruders, including Powell, went to the kitchen while Horne stayed behind in Father's bedroom.[2] Father testified, "After they went to the kitchen and done whatever they was doing to my son and his girlfriend when I told him just to let it go, not to fight with them, that I – I'd deal with it, then that's when he came back to the room." Father clarified that the man who returned to his bedroom was Powell.

Father described his condition as "dazed" at the time the men left his house. He also acknowledged that he was bleeding and that he "had lost quite a bit of blood." He was taken to the hospital after the attack and treated.

On cross-examination, Father acknowledged that he told the police that there had been a third person involved in the home invasion. He knew this person's first name as "Sean" but did not know his last name. Father recognized this man by the spider web tattoo on his neck.

---

[1] When the prosecutor asked Father if he had been threatened, Father responded, "Yes." When asked whether Horne's brother had threatened him, Father replied, "It does not matter."

[2] Although Father did not testify that the man who remained was Horne, Son's testimony makes clear that it was Powell and the third man who went to the kitchen.

He later learned that Sean's last name was "Harr" or "Harden" or "[s]omething like that." This third man was not related to anyone in Father's household. He told the police and repeated at trial that this third man was not named Kitts.

Son testified that he was twenty-one years old. In March 2009, he was living with Father in Knoxville. On March 20th, his fiancee, Sarah Kubas, was with him at Father's house. Father was home at the time. About one o'clock in the morning, he and Kubas were in the garage but decided to return to the house. On the way, he looked out the garage window and saw a white car in the driveway. He did not think anything was wrong, however, as they frequently had visitors.

Son and Kubas walked in the back door of the house, and Kubas walked toward the bathroom while Son walked toward the living room. When he got to the dining room doorway, he saw a "tall gentleman" going through a dresser. At the same time, Kubas was approaching. Son demanded to know what the man was doing. In response, the man turned toward Son and pulled his shirt up to cover his face. The man tried to run past Son and get to Father's bedroom, "but something was behind the door and he couldn't get into the door exactly." Son grabbed the man, but "he managed to get the door open wide enough to go through the door." At that point, Son heard Father in the bedroom "fighting somebody."

Son explained what happened next:

> I mean, I'm not a small guy, there's really not a lot you can put behind that door that's going to stop me from coming through it, so I went through the door. When I went through the door, I had my head down and when I opened the door I got hit across the back of the head. And I raised up and I swung at the person in front of me, which was Mr. Powell, because his shirt came down when he hit me. And I swung at him, he hit me again on top of the head, my dad told me just to quit fighting, let them have whatever they wanted. So I put my hands up, he proceeded to strike me again, pushed me backwards. And when my dad told me to let them have whatever they wanted, I told my girlfriend just pull your hood up and lay down and look at the floor. And [Powell] told me to get on my knees.
>
> I sat down on my knees and he wanted everything out of my pockets; wanted to know – where he started, he took my wallet and my lighters and everything in my pockets. And he started asking me about my dad's medicine: "Where's the pills? Where's the jewelry?" Where's stuff like that? I told him I don't give a shit about none of that. He said, "Well then what are you doing here?" . . . I said, "I live here." He said, "Who are you?" I said, "You know who I am, you have my wallet." And at that point, my hood was already up,

because when he put me on my knees he pulled my hood up over my head. He put the gun down against my forehead and he lifted my hood up to look at me, and when he done that I looked up at him.

He sees me, he lets my hood go, and he kicked me in the top of my head and after he kicked me in the top of the head he kicked me a couple times, he hit me once or twice more with the gun and then they proceeded to search my fiancee.

Son stated that they took Kubas's wallet "and everything out of her pocket." He also clarified that "they" were "Mr. Powell and Mr. Hart." Son explained that, at the time, he did not know "Mr. Hart's" name.

Son continued,

And after they were done searching us and whatnot, they told us that we needed to stand up and look at the floor. We stood up and continued looking at the floor, and I made sure [Kubas] was in front of me and the doorway. They put the gun to the back of my head and [Powell] told me that I need to walk or he's going to fucking shoot me.

They walked me into the kitchen, they told us we need to lay down on the floor. When we laid down on the floor, I was struck again and he said that if we got up he would shoot us. Then they walked away and I heard the door shut, and we stayed on the floor for a moment until I heard my dad fall out of his room. And I got up and I walked back in there, and my dad was laying up against the wall, coming out of his bedroom . . . . He was laying against the wall and there was just blood all over the place. He was – his head was busted open. My father's crippled, he has issues walking.

In all honesty, I have to tell you, the fact – laying there, having to lay there and listen to my father get beat like that, having to lay there and listen to my dad get hit with guns, knowing that my dad is crippled the way he is – is probably the worst feeling I've ever had in my life.

Son asked Father for his phone, but the assailants had taken it; they had also taken Son's phone. Son sought help from neighbors and passing motorists, asking for people to call the police. The police subsequently arrived.

Son explained that he recognized Powell, in part because Powell was wearing a pair of shoes that Son knew Powell had obtained from Son's brother. He also recognized Powell's

voice and stated that Powell "kept asking for his Aunt Connie." Son clarified that Powell made him and Kubas walk from the living room to the kitchen.

Son stated that he never saw the third person in the house and had never met Horne. The only people he saw were Powell and Hart. Son explained that Father was crippled and suffered from seizures. Father had a prescription for Oxycontin and "roxys and stuff like that."

On cross-examination, Son acknowledged that he was not able initially to identify photographs of the Defendants. He explained his inability to identify Powell's photograph as resulting from his being "distraught" at the time he was shown the photograph. He reiterated the number of times he was struck with the gun and kicked but stated that he refused medical treatment. On redirect, he clarified that he was sure of his identification of Powell and explained that he had known Powell for about ten years.

Michael Alan Mays, the records keeper for the Knox County Emergency Communications district, identified the recordings of 911 calls made regarding the instant offenses. The recordings were played for the jury. Four individual calls were recorded, three from neighbors and one from a woman who had been driving down the street and whom Son flagged down. Each of the callers stated that a man was yelling for help and asking that the police be called.

Connie Stinnett testified that she was at the hospital during the events at issue. On her way home, she got a text message from Father's cell phone asking, "Where are you? When are you going to be here?" She thought the message was "kind of weird" because Father did not send her text messages. She explained that he "hates texting" and has difficulties reading and writing. When she arrived home, Son ran up to her "and hollered, 'They came in. Daddy's hurt.'" As she walked up to the house, she saw Father "standing in the doorway pouring blood." She stated that Father was upset and that she was worried that he was going to have a seizure. Father told her that "your nephew's done it this time."[3] She asked him what had happened, and he replied, "Your nephews came in and pistol whooped me." She asked to which nephews he was referring, and he told her it was Powell and Horne. He also told her that there was a third man but that "he didn't really know his name." Stinnett explained that Horne's brother was Michael Keith Kitts, who had a white car. Stinnett identified Powell and Horne at trial.

Stinnett testified that, a couple of weeks prior to these events, Powell, Horne, and "Sean" had visited and were asking her about her jewelry. There was one ring in particular

---

[3] The transcript states "nephew's." We recognize that "nephews" or "nephews'" would sound the same.

that all three of them said they would like for their girlfriends. She did not want to sell it, however, as she had just gotten it.

On cross-examination, Stinnett denied selling drugs. She also denied that Father sold drugs. She denied having ever tried to purchase Oxycontin for Father. She stated that she took both Xanax and Prozac and that she had filled her Xanax prescription just before March 20th. The resulting bottle of 120 Xanax tablets had not yet been opened.

Amber Ward testified that she was a registered nurse in the emergency department of the University of Tennessee Medical Center. She assisted in treating Father during the early morning hours of March 20th. Father suffered from "multiple contusions on the posterior back of the head . . . and then a laceration . . . on the right side of the forehead." There was an additional injury "on the left side of the face and his eye."

Officer Doyle Lee of the Knoxville Police Department testified that he responded to the call at Father's house. He explained that the officers' uniforms were equipped with microphones and that his interactions with the people on the scene were recorded. The recording was played for the jury. A man's voice can be heard exclaiming that "they got all our cell phones." Another man says that "they took my medicine," that there was a "small white car," and that "they was gonna try to shoot me." This same man describes two pistols and also says, "my nephews." He also describes three rings that were taken from him. Also recorded is the voice of an officer calling in a description, including a Subaru or Nissan small white sedan, three white males, and "Randall Scotty Horne."

Officer Michael Price also responded to the call; a separate recording was made from his microphone. He described the scene as "pretty chaotic" with "people approaching our car screaming and hollering all kinds of things to us." The victims did not mention Michael Kitts to him. He developed Kitts as a possible suspect based on his own investigation and prior knowledge of Kitts. On the recording made during his participation, also played for the jury and included in the record, a man's voice is heard exclaiming, "Michael and Scott" and "I know it was." A man's voice also told the police that the attackers had their jackets pulled up over their mouths. A man stated that he was kicked in the head and hit with a pistol. A male voice is also heard stating, "Sean is some guy they all know."

Lois Ann Woody testified for Horne. She was Horne's and Powell's grandmother and Stinnett's mother. Woody stated that, the week before trial, Father told her that "he did not believe that it was [Horne], they had a mask on," and that the only assailant he could identify was the man with the spider tattoo on his neck. He also told her that he had been "doped up" that day on his medicine.

The jury convicted the Defendants of all charges. After a hearing, the trial court sentenced Powell as a Range I, standard offender to three years on the aggravated burglary; eight years on each of the aggravated robberies; eighteen years on each of the especially aggravated kidnappings; three years on each of the aggravated assaults; six years for employing a firearm during the commission of a dangerous felony; and three years for possessing a firearm with the intent to go armed during the commission of a dangerous felony. The trial court merged each pair of aggravated robbery convictions, leaving three in place. The trial court merged each pair of the especially aggravated kidnapping convictions, leaving two in place. The trial court also merged the two aggravated assaults into a single conviction and merged the possessing a firearm conviction into the conviction for employing a firearm. The trial court ordered all sentences to run concurrently with the exception of the firearm conviction, which it ordered to run consecutively to the sentences for the aggravated robbery and especially aggravated kidnapping convictions. Accordingly, Powell's effective sentence was twenty-four years, with the sentences for his especially aggravated kidnappings to be served at 100%. See Tenn. Code Ann. § 40-35-501(i)(1), (2)(C) (Supp. 2008). The trial court imposed the same sentences on Horne and ordered the same mergers, thereby imposing the same effective sentence.

On appeal, Powell contends that (1) his convictions for especially aggravated kidnapping offend due process and (2) the trial court erred in ordering the sentence for his firearm conviction to run consecutively to his sentences for especially aggravated kidnapping and aggravated robbery. Horne also contends that his convictions for especially aggravated kidnapping offend due process and argues additionally that the evidence is not sufficient to support his convictions. We will address the due process issue first. We will then address Horne's contentions regarding the sufficiency of the evidence.

**Analysis**

*Especially Aggravated Kidnapping*

Our criminal code defines especially aggravated kidnapping, as charged in this case, as follows: "Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-305(a)(1) (2006). False imprisonment, in turn, is defined as follows: "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a) (2006). The Defendants complain that their convictions for especially aggravated kidnapping offend due process because the conduct forming the basis of these convictions was "essentially incidental" to the conduct forming the basis for their aggravated robbery convictions. The

Defendants rely on State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), and its progeny for their argument.

In Anthony, the Tennessee Supreme Court addressed "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." Id. at 300. Finding double jeopardy analysis to be inapposite, id. at 303, the court turned instead to the Tennessee Constitution's guarantee of due process. Id. at 306. The court set forth the following test for determining whether dual convictions could stand: "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Id.

Several years later, in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), the court rewrote this test as a two-part inquiry. The first prong required a determination of "whether the movement or confinement was beyond that necessary to consummate" the accompanying felony. Id. at 535. If that inquiry was answered affirmatively, "the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. An affirmative answer to both inquiries supported a separate kidnapping conviction. Id. at 535-36. Subsequent application of this precedent has resulted in problematic analyses and inconsistent results.

The Supreme Court recently tackled this vexing problem in State v. White, __ S.W.3d __, 2012 WL 758916 (Tenn. 2012), and expressly overruled Anthony and Dixon. Id. at *17. After undertaking a comprehensive review of the evolution of Tennessee's kidnapping statutes, the court concluded that our current kidnapping offenses "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." Id. at *14. Significantly, the court also determined that the due process concerns earlier expressed in Anthony more properly were addressed in the first instance to the jury rather than to an appellate court:

> [W]e have concluded that whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law. The jury, whose primary obligation is to ensure that a criminal defendant has been afforded due process, must evaluate the proof offered at trial and determine whether the State has met its burden. Our task, therefore, of assessing the sufficiency of the convicting evidence qualifies as the ultimate component of this constitutional safeguard. The separate due process test articulated first in Anthony, and subsequently

-9-

refined in <u>Dixon</u> and its progeny, is, therefore, no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony.

<u>Id.</u> at *15 (citations omitted).

Thus, the <u>White</u> court determined that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." <u>Id.</u> In order to assist juries in accomplishing this task, the court set forth the following instruction to be provided juries on the "substantial interference" element of a kidnapping offense:

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

- the nature and duration of the victim's removal or confinement by the defendant;

- whether the removal or confinement occurred during the commission of the separate offense;

- whether the interference with the victim's liberty was inherent in the nature of the separate offense;

- whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

- whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

- whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

<u>Id.</u> at *17-18 (footnote omitted).

-10-

The White court emphasized that it was not articulating a new rule of constitutional law and that its decision does not require retroactive application. Id. at *16. However, on the facts of the case before it, the court concluded that the "proof could be interpreted in different ways and, therefore, the determination of whether the removal or confinement of [the victim] constituted a substantial interference with her liberty was a question of fact for the jury to resolve." Id. at *17. The court then reviewed the jury charge provided and recognized that, while the instructions tracked the statutory language, "they did not define the key element – the substantial interference with the victim's liberty – as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." Id. Accordingly, the court held, "[b]ecause the jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony, the Defendant is entitled to a new trial on the especially aggravated kidnapping charge." Id.

In the instant case, the proof in support of the Defendants' especially aggravated kidnapping convictions consists of Son's testimony that, after Powell and the third man (Sean) took property from Son and Kubas in the immediate vicinity of Father's bedroom, Powell, accompanied by Sean, forced Son and Kubas into the kitchen at gunpoint, made them lie down, and ordered them to remain there. The proof also established, however, that Son had tried to stop the robbery of Father and that Horne remained with Father while Powell and Sean forced Son and Kubas into another room. Therefore, the proof is susceptible of at least two interpretations: (1) that Powell and Sean removed Son and Kubas from the scene of the robberies as discrete criminal activity after the robberies had been completed, or (2) that Powell and Sean were separating Son and Kubas from Father so that Horne could proceed with the robbery of Father without further interference. Accordingly, the determination of whether the removal or confinement of Kubas and/or Son constituted a substantial interference of either victim's liberty that was to a greater degree than necessary to commit the aggravated robbery of Father was a question of fact for the jury to resolve. See id.[4]

The trial court instructed the jury on the counts charging the especially aggravated kidnapping of Kubas as follows:

> For you to find the defendant [guilty] of the offense [of especially aggravated kidnapping], the State must have proven beyond a reasonable doubt the existence of the following essential elements,

---

[4] That Horne was not identified as actively assisting in the movement and/or confinement of Son and Kubas, in and of itself, does not absolve him of potential criminal liability for especially aggravated kidnapping. As an identified participant in the aggravated burglary of Father's residence and the aggravated robbery of Father, Horne is potentially subject to being found guilty of the especially aggravated kidnappings of Son and/or Kubas under the theory of criminal responsibility for the conduct of another. See Tenn. Code Ann. § 39-11-402(2) (2006).

-11-

(1) That a defendant knowingly removed or confined Sarah M. Kubas unlawfully so as to interfere substantially with her liberty, and

(2) That the confinement or removal was accomplished with a deadly weapon, or by display of any article used or fashioned to lead Sarah M. Kubas to reasonably believe it was a deadly weapon.

. . .

A removal or confinement is unlawful when it is accomplished by force, threat, or fraud[.]

Identical instructions were given regarding the especially aggravated kidnapping of Son. Later, in the charge on the lesser-included offense of false imprisonment, the trial court instructed the jury as follows:

Any person who commits the offense of false imprisonment is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements,

(1) That the defendant removed or confined another unlawfully so as to interfere substantially with the other's liberty, and

(2) That the defendant acted knowingly.

The trial court's jury charge in this case is virtually identical to the charge delivered in White. See id. And, as in that case, "[w]hile these instructions track the statutory language, they did not define the key element – the substantial interference with the victim's liberty – as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." Id. Therefore, we are constrained to hold that, because the jury was not properly instructed on the question of whether the removal or confinement of Son and Kubas was essentially incidental to an accompanying felony, the Defendants' convictions of especially aggravated kidnapping must be reversed and the Defendants must be afforded a new trial on the especially aggravated kidnapping charges.[5] Id. at *18. Upon retrial, the trial court should instruct the jury as provided in White or as

_____

[5] We recognize that the trial court instructed the jury in accordance with the pattern jury instructions applicable at the time of trial. We also recognize that the trial court had no way to predict the results of White at the time of the trial of this case.

-12-

provided in any revisions to the pattern jury instructions adopted by the Committee on Criminal Pattern Jury Instructions in response to White.[6]

*Sufficiency of the Evidence Supporting*
*Horne's Remaining Convictions*

Horne was also convicted of aggravated burglary; the aggravated robberies of Father, Son, and Kubas; the aggravated assault of Son; employing a firearm during the commission of a dangerous felony; and possessing a firearm with the intent to go armed during the commission of a dangerous felony. He challenges the sufficiency of the evidence supporting each of these convictions.[7]

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

---

[6] In White, the court adopted an interim instruction as set forth above to be used by the trial courts until the Committee on Criminal Pattern Jury Instructions develops an appropriate instruction implementing this decision. Id. at *18.

[7] The State addresses in its brief only the sufficiency of Horne's especially aggravated kidnapping convictions. A close reading of Horne's brief, however, leads us to conclude that he is challenging the sufficiency of the proof on all of his convictions.

Aggravated Burglary

Aggravated burglary is defined as the "burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." Tenn. Code Ann. § 39-14-403(a) (2006). A "habitation" is defined as including "any structure, including buildings, . . . which is designed or adapted for the overnight accommodation of persons[.]" Id. § 39-14-401(1)(A). As charged in this case, a "burglary" is committed when the perpetrator, "without the effective consent of the property owner . . . [e]nters a building and commits . . . assault." Id. § 39-14-402(a)(3) (2006). "Assault" is defined as including the intentional, knowing or reckless infliction of bodily injury to another. Id. § 39-13-101(a)(1) (2006). The proof in this case established that Horne, along with Powell and Sean, entered Father's residence without Father's consent. Horne and Powell pistol-whipped Father. Father's resulting injuries included multiple contusions and a laceration to his head as well as significant bleeding. These injuries satisfy the definition of "bodily injury." See id. § 39-11-106(a)(2) (2006) (defining "bodily injury" as including "a cut, abrasion, bruise, burn or disfigurement, and physical pain"). This evidence is sufficient to support Horne's conviction of aggravated burglary.

Aggravated Robbery

Horne was convicted of committing the aggravated robberies of Father, Son, and Kubas. As charged in this case, aggravated robbery is a robbery "[a]ccomplished with a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1) (2006). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a) (2006). Horne was charged in alternative counts with committing an aggravated robbery against each victim by (1) violence and by (2) putting the victim in fear. The proof in this case established that Horne took jewelry and medication from Father after brandishing his gun and pistol-whipping Father. This evidence is sufficient to sustain Horne's dual convictions of the aggravated robbery of Father.[8] See State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002) (recognizing that pointing a gun at a robbery victim satisfies both the violence and putting in fear criteria).

According to Son, Powell and Sean took property from Son and Kubas after Powell hit and kicked Son and brandished his weapon. There is no proof in the record that Horne actively participated in these two aggravated robberies. However, a perpetrator may be held criminally responsible for a crime committed by another under the doctrine of criminal responsibility for the conduct of another. See State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000). Our criminal code provides that "[a] person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person

---

[8] The trial court properly merged the dual convictions.

solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2006).[9]

While a defendant's mere presence during the commission of a crime will not render him criminally responsible for the conduct of another, "[n]o *particular* act [by the defendant] need be shown." State v. Jones, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999) (emphasis added); see also State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). Indeed, mere encouragement of the principal is sufficient. Jones, 15 S.W.3d at 890. Moreover, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime my be inferred." Id.

In this case, the proof supports the inference that all three perpetrators were acting as a team. Horne and Powell attacked Father and when Son tried to intervene, Son was attacked. Father instructed Son to stop resisting and to let the men have what they wanted. Father also ceased his resistance out of fear for Son's safety. The perpetrators, including Horne, were thereby given the opportunity to obtain additional property, an opportunity they took. Horne's attack on Father, and the ensuing attack on Son, thereby enabled the aggravated robberies of Son and Kubas. The aggravated robberies of Son and Kubas were accomplished at gunpoint, again satisfying the elements of both violence and putting the victims in fear. After marching Son and Kubas to the kitchen at gunpoint, Powell returned to Father's bedroom. Son testified that he heard the sounds of his father being beaten while he was in the kitchen. The proof therefore supports the inference that Horne was acting with the intent to promote or assist in the aggravated robberies of Son and Kubas, or to benefit in the proceeds thereof, and that Horne aided or attempted to aid Powell and Sean to commit the aggravated robberies of Son and Kubas. Accordingly, we hold that the proof is sufficient to support Horne's dual convictions of the aggravated robberies of Son and his dual convictions of the aggravated robberies of Kubas.[10]

## Aggravated Assault

Horne was charged with two alternative counts of committing an aggravated assault against Son. Count 12 charges Horne with "unlawfully and knowingly caus[ing] Michael K. Mount to reasonably fear imminent bodily injury, while . . . using a deadly weapon." Count 13 charges Horne with "unlawfully and knowingly caus[ing] bodily injury to Michael K. Mount while . . . displaying a deadly weapon." Son testified that, when he interrupted Horne's

---

[9] At oral argument, counsel for Horne, in response to a question from the Court, indicated that the trial court did not charge criminal responsibility in this case. A review of the jury charge in the record demonstrates to the contrary.

[10] The trial court properly merged the dual convictions as to each victim.

and Powell's attack on Father, Powell struck him repeatedly with his handgun and also kicked him several times. Powell also threatened to shoot Son. Although Son did not testify that he was afraid, the fact that Son acquiesced to Powell's demands indicates circumstantially that he was afraid that, if he did not, Powell would shoot him. Moreover, this Court has recognized that being threatened with a weapon is circumstantial evidence sufficient to establish reasonable fear of imminent bodily injury. See State v. Jessie James Austin, No. W2001-00120-CCA-R3-CD, 2002 WL 32755555, at *5-6 (Tenn. Crim. App. Jan. 25, 2002). For the same reasons set forth above, the proof also supports the inference that Horne was criminally responsible for Powell's actions. We hold that the evidence is sufficient to support Horne's conviction of aggravated assault as charged in Count 12. We also hold that the evidence is sufficient to sustain Horne's conviction of aggravated assault as charged in Count 13.[11] Although Son refused medical care, he testified that he was struck several times in the head and also kicked several times. We hold that this testimony is sufficient to satisfy the element of bodily injury. See Tenn. Code Ann. § 39-11-106(a)(2) (defining "bodily injury" as including "a cut, abrasion, bruise, burn or disfigurement, and physical pain").

Possessing/Employing a Firearm

Horne was convicted of possessing a firearm "with the intent to go armed during the commission of . . . a dangerous felony," Tennessee Code Annotated section 39-17-1324(a) (Supp. 2008), and employing a firearm during the commission of a dangerous felony, id. § 39-17-1324(b)(1). The trial court subsequently merged the possession offense into the employing offense. We recognize two potential problems with Horne's convictions of these offenses.

First, the indictment does not specify the "dangerous felony" which allegedly gave rise to the firearms offenses. The dangerous felonies which may serve as a predicate for the firearms offenses are statutorily enumerated. See id. § 39-17-1324(i)(1). They include both especially aggravated kidnapping and aggravated burglary. Id. § 39-17-1324(i)(1)(D), (G). They do not include either aggravated robbery or aggravated assault. Id. However, the State charged the firearms offenses simply as follows:

> [o]n or about the ___ day of March, 2009, in the State and County aforesaid, [Horne] did unlawfully and knowingly possess a firearm with the intent to go armed during the commission of a dangerous felony in violation of T.C.A. 39-17-1324, and against the peace and dignity of the State of Tennessee[;]

and

_____

[11] The trial court properly merged the dual convictions.

-16-

[o]n or about the ___ day of March, 2009, in the State and County aforesaid, [Horne] did unlawfully and knowingly employ a firearm during the commission of a dangerous felony in violation of T.C.A. 39-17-1324, and against the peace and dignity of the State of Tennessee.

Our criminal code provides that an indictment:

must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

Tenn. Code Ann. § 40-13-202 (2006).

The Tennessee Supreme Court has made clear that "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Nevertheless, this Court has recognized that "[a] lawful accusation is a condition precedent to jurisdiction" and that "[a] judgment obtained in the absence of an indictment alleging each essential element of the offense is a nullity." State v. Lewis, 36 S.W.3d 88, 97 (Tenn. Crim. App. 2000). Therefore, we are faced with the issue of whether the designation of the predicate dangerous felony is an "essential element" that must be specified in the charging instrument.[12]

The Tennessee Supreme Court has recognized that the term "essential element" may mean *either* "the elements necessary for conviction" of the offense, *or* "the elements necessary to inform the accused of the charge." Hill, 954 S.W.2d at 728-29 n.4. The court also has emphasized its rejection of strict pleading requirements and has held repeatedly that "an indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements" of charging instruments. State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000) (citing State v. Sledge, 15 S.W.3d 93, 94 (Tenn. 2000); State v. Carter, 988 S.W.2d 145, 148-49 (Tenn. 1999); Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998)). Moreover, the court has emphasized that "alternative means or theories of establishing a single element of an offense need not be included in an indictment." Id. at 301 (citing State v. Lemacks, 996 S.W.2d 166 (Tenn. 1999)).

_____

[12] We recognize that the pattern jury instructions for these firearm offenses make the predicate dangerous felony offense an essential element for purposes of convicting a defendant of these crimes. See T.P.I. – Crim. 36.06(c). However, this does not necessarily mean that the predicate dangerous felony offense is an essential element for indictment purposes.

A review of the indictment in the instant case in light of these principles presents a close question. Cf. State v. Christopher Ivory Williams, No. W2009-01638-CCA-R3-CD, 2011 WL 1770655, at *10 (Tenn. Crim. App. May 9, 2011), perm. app. denied (Tenn. Aug. 24, 2011) (holding that felony murder charge that failed to designate predicate felony was fatally defective, but the trial court's error in failing to dismiss the charge was harmless because the defendant was also convicted of premeditated murder). We, however, conclude that it is not necessary to determine whether the indictment was adequate to charge the firearms offenses under the facts of this case. Even if we assume that the indictment is adequate, a second, related problem remains. Our close review of the jury instructions, transcribed as delivered to the jury, reveals that the trial court did not instruct the jury as to what "dangerous felony" was at issue. Instead, the trial court instructed the jury as follows:

> Any person who possesses or employs a firearm during the commission of or attempt to commit a dangerous offense is guilty of a crime. For you to find the defendant guilty of the offense [of employing a firearm during the commission of a dangerous felony], the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> > (1) That the defendant employed a firearm, and
>
> > (2) That the employment was during the commission of or attempt to commit a dangerous felony, and
>
> > (3) That the defendant acted either intentionally, knowingly, or recklessly.
>
> For you to find the defendant guilty of the offense of [possessing a firearm with the intent to go armed during the commission of a dangerous felony], the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> > (1) that the defendant possessed a firearm, and
>
> > (2) That the possession was with the intent to go armed during the commission of or attempt to commit a dangerous felony.

The jury was given no instruction on the definition of "dangerous felony" or which "dangerous felony" was at issue in this case. Rather, the jury was left to decide for itself what constituted the requisite "dangerous felony."

Obviously, the jury had before it four other felonies upon which it could have relied in considering Horne's guilt of the firearms offenses: aggravated burglary, aggravated robbery, especially aggravated kidnapping, and aggravated assault. However, as previously noted, only especially aggravated kidnapping and aggravated burglary are listed as dangerous felonies under this statute. See Tenn. Code Ann. § 39-17-1324(i)(1). The list does not include aggravated robbery or aggravated assault. Id.

Additionally, the firearms statute provides that "[a] person may not be charged with [this crime] if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged." Tenn. Code Ann. § 39-17-1324(c). In this case, Horne was charged with committing especially aggravated kidnapping "with a deadly weapon." The only deadly weapon about which any proof was adduced was a gun. Accordingly, the especially aggravated kidnapping could not serve as the predicate offense for the firearms convictions.

Horne's charge of aggravated burglary was alleged in the indictment as follows:

On or about the ___ day of March, 2009, in the State and County aforesaid, [Horne] did unlawfully and knowingly enter the habitation of [Father] without his effective consent, not open to the public, did commit Assault, in violation of T.C.A. 39-14-403.

The elements of aggravated burglary as charged in this case are set forth above and do not include the possession or employment of a firearm. Thus, the only predicate dangerous felony upon which the firearms charges could be based is the aggravated burglary.

There is no way to discern from the record before us whether the jury relied on the aggravated burglary or one (or more) of the other offenses charged in this case in determining Horne's guilt of the firearms offenses. This issue has not been raised by any of the parties. We, however, are constrained to hold that it is necessary to address this issue as plain error. See Tenn. R. App. P. 36(b). This Court has the discretionary authority to grant relief for plain error when the following five prerequisites are satisfied: "(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice." State v. Jordan, 325 S.W.3d 1, 58 (Tenn. 2010) (quoting State v. Banks, 271 S.W.3d 90, 119-20 (Tenn. 2008)).

In this case, the record clearly reflects that the trial court did not provide the jury with adequate instructions on the crime of possessing/employing a firearm during the commission of a dangerous felony. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will

-19-

be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). Moreover, the trial court must provide the jury with proper instructions as to the law governing the issues raised and the evidence introduced even without request. Id. The trial court's instructions in this case breached this clear and unequivocal rule of law.

We also hold that a substantial right of the accused was adversely affected. Horne was convicted of offenses about which the jury had incomplete and inaccurate instructions. The jury was given no guidance as to the definition of "dangerous felony" and was free to choose from four other felonies charged in the case, three of which were not available to support the firearms offenses. See Tenn. Code Ann. § 39-17-1324(i)(1). Therefore, the jury may have convicted Horne of crimes that do not exist.

As to the final two factors of plain error review, the record is devoid of any indication that Horne waived this issue for tactical reasons, and we can conceive of no reason for deciding to expose oneself to conviction of a nonexistent crime. Furthermore, consideration of this error is necessary to do substantial justice because due process does not countenance the conviction of a nonexistent crime. See, e.g., Adams v. Murphy, 653 F.2d 224, 225 (5th Cir. 1981) ("Nowhere in this country can any man be condemned for a nonexistent crime."). Accordingly, we hold that the trial court committed plain error in its instructions to the jury on the crimes of possessing a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission of a dangerous felony. The remedy for an instructional error of this magnitude is reversal of the convictions and remand for a new trial. See, e.g., White, 2012 WL 758916, at *17 (reversing defendant's conviction of especially aggravated kidnapping and remanding for a new trial because the "jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony"); Howard, 30 S.W.3d at 273 (reversing defendant's conviction of premeditated murder and remanding for new trial because trial court did not instruct jury on natural and probable consequences rule).

Although we have been referring to Horne's convictions of possessing/employing a firearm during the commission of a dangerous felony, we note that the State indicted Powell in the same manner for possessing a firearm with the intent to go armed during the commission of a dangerous felony and for employing a firearm during the commission of a dangerous felony. The trial court's instructions to the jury were the same for these offenses as for Horne's, the jury convicted Powell of both offenses, and the trial court subsequently merged them. We hold that the same plain error analysis applies. Therefore, we also must reverse and remand for a new trial Powell's convictions of possession of a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission of a dangerous felony.

*Sentencing*

Powell complains that the trial court committed reversible error in ordering his sentence for employing a firearm during the commission of a dangerous felony to be served consecutively to his sentences for especially aggravated kidnapping and aggravated robbery. Because we have reversed and remanded for retrial Powell's convictions of the firearms offenses, this issue is moot and we need not address it. See State v. Thornton, 10 S.W.3d 229, 244 (Tenn. Crim. App. 1999); State v. Mencer, 798 S.W.2d 543, 549 (Tenn. Crim. App. 1990). We note for the trial court's guidance on retrial, however, that the statute provides that the sentence imposed for either of the firearms offenses charged in this case "shall be served consecutive to any other sentence the person . . . is sentenced to serve for conviction of the *underlying dangerous felony.*" Tenn. Code Ann. § 39-17-1324(e)(1) (emphasis added). As set forth above, the only eligible underlying dangerous felony in this case is aggravated burglary. Accordingly, if Powell and/or Horne is convicted of the firearms offenses on retrial, the sentence imposed thereon must be served consecutively specifically only to the sentence on the aggravated burglary conviction.[13]

**Conclusion**

Pursuant to the Tennessee Supreme Court's recent decision in White, we are constrained to reverse and remand for a new trial the Defendants' convictions of especially aggravated kidnapping. Additionally, based upon the trial court's instructional errors on the Defendants' convictions of (1) possession of a firearm with the intent to go armed during the commission of a dangerous felony and (2) employment of a firearm during the commission of a dangerous felony, we also must reverse those convictions and remand for a new trial. We affirm the Defendants' remaining convictions and sentences.

_____
JEFFREY S. BIVINS, JUDGE

---

[13] The State argues in its brief to this Court that the trial court ordered consecutive sentencing on the basis of finding Powell to be a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(4) (2006). The record, in no way, supports this assertion. Indeed, to the contrary, the trial court specifically held that consecutive sentencing under section 40-35-115 "is not actually justified." We are at a loss to understand the State's argument on this issue.